**NATIONAL CITY BANK, as Indenture Trustee for Holders of Gambles Credit Corporation, etc., Appellants,**

v.

**COOPERS & LYBRAND, Respondent.**

**No. C1–86–2224.**

Court of Appeals of Minnesota.

July 21, 1987.

Review Denied Oct. 21, 1987.

Allen D. Barnard, James C. Daracles, Best & Flanagan, Minneapolis, for appellants.

Robert R. Weinstine, Darron C. Knutson, Steven C. Tourek, Winthrop & Weinstine, St. Paul, for respondent; Hughes, Hubbard & Reed, Washington, D.C., of counsel.

Heard, considered, and decided by RANDALL, P.J., and WOZNIAK and NIERENGARTEN, JJ.

## OPINION

WOZNIAK, Judge.

Appellant National City Bank (NCB) appeals from the summary judgment entered in favor of respondent Coopers & Lybrand (C & L). NCB brought this action against C & L as indenture trustee for noteholders of two sets of notes issued by Gambles Credit Corporation (GCC), alleging negligence in C & L's audit of GCC's financial affairs, misrepresentation, and breach of contract as a third party beneficiary. The trial court granted summary judgment against NCB, holding that NCB did not have standing as an indenture trustee to bring the action and was not the proper plaintiff in the case and that NCB had alleged a derivative claim which was precluded by GCC's bankruptcy. We affirm.

## FACTS

NCB was the indenture trustee under two indenture agreements governing three separate series of subordinated notes, totaling $66,760,000, issued by GCC in 1977 and 1978 and sold to public investors. Under the indenture agreements, NCB was authorized to act for the noteholders according to the terms of the indentures. As trustee, NCB was to administer the provisions of the indentures for the benefit of the noteholders and was primarily responsible for receiving periodic payments of principal and interest from GCC and redistributing the payments to the registered noteholders, for ensuring that the covenants in the indenture were performed by examining reports and certificates furnished by GCC and outside professionals, and for protecting the trust res in the event of default by enforcing the remedial provisions contained in the indentures. Conversely, the noteholders were not permitted to take any action relating to the indentures, except under special circumstances.

At the time the notes were issued, GCC was a wholly-owned subsidiary of Gamble-Skogmo, Inc. (GSK). GCC was organized to finance the accounts receivable generated by GSK and its retail subsidiaries. GCC purchased from GSK and its retail subsidiaries accounts receivable consisting primarily of charge account debt owed by retail customers. GCC operated as a finance business by borrowing funds from a group of banks and using the public debt obtained from the sale of the notes. The funds were paid to GSK in return for receivables. GCC's only material assets were the accounts receivable which it purchased from GSK and its retail subsidiaries. The receivables provided security for approximately $268,000,000 of debt, including the notes.

In 1980, Wickes Companies, Inc. (Wickes) acquired GSK and its subsidiary GCC. After acquiring GSK and GCC, Wickes retained C & L to audit GCC's financial statements. One of the purposes of the audit was to assist in meeting the reporting requirements under various debt agreements similar to the indentures. C & L issued a report for GCC's January 1981 financial statement, offering its opinion that the statement fairly presented GCC's financial position as of January 1981, "in conformity with generally accepted accounting principles." GCC's financial statements contained direct representations that GCC had purchased the receivables upon which the noteholders depended for payment on the notes. NCB received a copy of C & L's report and GCC's 1981 financial statement.

In 1982, Wickes and most of its subsidiaries, including GSK and GCC, filed petitions in bankruptcy court, seeking reorganization under Chapter 11. Pursuant to the GCC Plan of Reorganization, GCC was merged into GSK, which in turn was merged into Wickes under the Wickes Plan of Reorganization. During the bankruptcy proceedings, an investigation of GCC's books showed that GCC's ownership interest in the receivables purchased from GSK was in doubt. The necessary documentation from GSK showing the transfer of assets was apparently lacking. C & L did not offer an opinion on GCC's financial statement of January 1982 because questions had arisen whether GCC had acquired valid title to the receivables. NCB alleges that C & L's failure to detect the lack of documentation for over $380,000,000 of receivables was the primary defect in the audit.

During the bankruptcy reorganization proceedings, a committee to protect the interests of GCC creditors was formed. The committee commenced an adversary proceeding in bankruptcy court against GSK seeking a declaration that GCC had a valid and enforceable ownership interest in the GSK receivables. The GCC creditors' committee, however, settled their claim against Wickes, GSK, and GCC. Under the settlement agreement, which the bankruptcy court approved, NCB received an unsecured claim against GSK in the amount of $66,760,000, the full principal amount of the notes. In exchange, GCC creditors, including NCB, released all claims against Wickes, GSK, and GCC. The settlement specifically did not release claims against any outside professionals retained by GCC prior to March 1, 1982.

As part of the reorganization, the notes were surrendered for cancellation in return for a distribution under the reorganization plan. Pursuant to the GSK Reorganization Plan, NCB received, on behalf of the noteholders, $44,512,056.47 in cash, $17,644,500 in Wickes notes, and Wickes common stock appraised at $1,559,958, for a total value of $63,716,514.47, or approximately 95% of the principal amount of the notes. At oral argument, counsel for NCB conceded that some noteholders purchased their notes at a discount subsequent to GCC's bankruptcy. The record does not disclose the number of such notes or at what discount they were bought.

In a related proceeding, at the time Wickes was filing for reorganization, eight securities class actions were filed against various Wickes entities, its officers and directors, and its auditors (including C & L) and financial advisers, alleging securities law violations. The defendants in these actions, other than Wickes, filed claims for indemnity and contribution from Wickes. These actions were consolidated under the caption *In re Wickes Companies Securities Litigation* in federal district court for the Southern District of California.

Prior to court approval of the Wickes Reorganization Plan, Wickes and the other defendants entered into a settlement with the class action plaintiffs. As part of the settlement, Wickes and GSK, into which GCC had merged, entered into a separate agreement with C & L, under which C & L agreed to contribute $1,100,000 to the settlement fund and to withdraw its claims against Wickes for indemnity and contribution. In exchange, Wickes agreed to release C & L from all claims arising from its actions or omissions in its capacity as accountant or auditor for Wickes, which was defined to include GCC. This settlement agreement between Wickes and C & L was expressly conditioned on bankruptcy court approval, and notice of the agreement was given to all creditors. Neither NCB nor the GCC creditor committee objected to the settlement agreement, which was approved by the bankruptcy court and subsequently implemented.

After receiving its bankruptcy distribution, NCB, as trustee for the noteholders, sued C & L seeking to recover $22,000,000 as the difference between the full amount due on the notes and the amount received in the bankruptcy distribution, plus accrued interest from the date of the GCC bankruptcy filing to the date of the distribution. NCB alleged, among other things, that C & L was negligent in conducting its 1981 audit of GCC and that it breached a duty of care to NCB. NCB claimed that if C & L had properly performed its duties as GCC's auditor and disclosed alleged deficiencies in GCC's interest in GSK receivables, NCB would have taken steps to correct those deficiencies. Presumably, by such action GCC's bankruptcy estate would have been worth more and the noteholders would have recovered in full. NCB's complaint also alleged fraud, aiding and abetting breach of a contract, and breach of a third-party beneficiary contract.

C & L moved for judgment on the pleadings or, alternatively, for summary judgment. The trial court granted summary judgment, holding that NCB lacked standing to bring the action as indenture trustee. The court noted that NCB's powers as trustee stemmed solely from the indenture agreements, which authorized it to bring suit on the notes. Since the notes were surrendered by the noteholders under the

bankruptcy reorganization, the court concluded NCB had no standing to represent the noteholders nor was it the proper plaintiff in the case because the noteholders had different interests which could not be protected by one trustee. The court also held that NCB's claims on behalf of the noteholders were derivative in nature, explaining that GCC sustained the direct injury, not the noteholders. The court noted that, as derivative claims, they belonged to GCC and could have been brought derivatively in GCC's name before the bankruptcy proceedings, but could never have been asserted directly by NCB on behalf of the noteholders.

### ISSUES

1. Did the trial court err in holding that NCB lacks standing and is not the proper plaintiff to bring this action?

2. Did the trial court err in holding that NCB's claims are derivative?

### ANALYSIS

On appeal, the function of a court reviewing a summary judgment is to determine whether any genuine issues of material fact exist and whether the trial court erred in its application of the law. *Betlach v. Wayzata Condominium,* 281 N.W.2d 328, 330 (Minn.1979). The facts are undisputed here, and the questions presented are whether the trial court erred in holding that NCB lacks standing to sue and that its claims are derivative.

1. NCB argues that the trial court mistakenly believed that NCB's power to bring suit was extinguished by GCC's bankruptcy. NCB relies on the powers conferred by the indenture agreements to support its position, claiming that the indenture agreements do not limit its power only to bring an action on the notes, but authorize it to enforce "any legal or equitable right" vested in it by the indenture or "by law."

■ A trustee derives his authority from the instrument creating the trust, and each case involving a question as to authority of the trustee must be decided in the light of the provisions of the particular trust instrument. *Sword v. Marquette National Bank of Minneapolis,* 252 Minn. 544, 546, 91 N.W.2d 75, 76 (1958). Indeed, the powers of a trustee under a corporate trust indenture are even more circumscribed than those of trustees generally. *See Meckel v. Continental Resources Co.,* 758 F.2d 811, 816 (2d Cir.1985) ("Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement.").

■ Under the terms of the indenture agreements, NCB's powers as trustee are limited to those necessary to enforce the obligations owing to the noteholders "on the notes" or "under the indenture." The indentures empower NCB as trustee to bring suit against the obligor on the notes to collect money due on the notes. The indentures contain no provision permitting NCB to bring a tort action against a third party for losses arising from the purchase or holding of the notes.

The trial court relied on *In re Equity Funding Corporation of America Securities Litigation,* 603 F.2d 1353 (9th Cir. 1979), in holding that NCB does not have standing to bring this action. In that case, the indenture trustee, a bank, sought to represent debenture holders not only in a bankruptcy proceeding to secure payment on the debentures, but also in a civil action alleging violations of securities laws and seeking to recover losses suffered on the debentures. While the bank had standing to represent the debenture holders in bankruptcy, the court denied it standing to press the securities litigation because neither the indenture nor federal law conferred any power on the trustee to represent the debenture holders except on claims on the debentures. *See id.* at 1360–61.

Similarly, the indenture agreements here limit NCB's actions to claims on the notes or under the indentures. NCB has no power to assert individual tort claims on behalf of the noteholders against third persons which are wholly extraneous to the rights

and obligations created by the notes and the indenture agreements.

■ Furthermore, the claims on the notes were resolved in the bankruptcy proceedings. The notes were surrendered and cancelled in exchange for the distribution under the Wickes Reorganization Plan. As a result of the bankruptcy proceedings, the indentures ceased to be effective pursuant to their express provisions, which read in relevant part:

> When * * * (b) *all the Notes not theretofore cancelled or delivered to the Trustee for cancellation* shall have become due and payable, or are by their terms to become due and payable within one year or are to be called for redemption within one year under arrangements satisfactory to the trustee for the giving of notice of redemption, and the Company shall deposit with the Trustee, in trust, funds sufficient to pay at maturity or upon redemption all of the Notes * * including principal and interest due or to become due to such date of maturity or redemption date * * * *then this Indenture shall cease to be of further effect* * * *.

(Emphasis added.) Under this express provision, NCB's power and authority ended with the surrender of the notes for cancellation. At that instant, the indentures "cease[d] to be of further effect," and whatever powers NCB had as trustee came to an end.

Despite NCB's claim that $22,000,000 remains due and owing under the indenture and that the indenture remains effective until this amount is recovered, nothing in fact remains due and owing under the indentures. The noteholders exchanged their notes and the obligation they represented for the payment made to them as part of the Wickes Reorganization. The rights and obligations created under the indentures have been extinguished. Consequently, NCB has no standing to sue under the indentures, as the trial court properly held.

■ NCB cautions that, unless it is permitted to bring suit, no one will be able to pursue this claim because the noteholders

do not have standing since their rights are limited by the indentures. NCB's warning, however, is predicated on a misunderstanding of the terms of the indenture agreements, which only bar the noteholders from bringing their own actions "under or with respect to" the indentures. Such suits are reserved to the trustee unless the trustee refuses to bring suit. Nothing in the indentures suggests that the noteholders do not have power to bring individual tort claims on their own behalf.

In fact, permitting NCB to maintain this action would be unfair to C & L because NCB does not have the power to bind the noteholders, who would still be free to bring their own action if they chose, even if NCB were to lose this action. In *Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972), the Supreme Court held that a reorganization trustee had no power to represent the debenture holders in a suit against a third party for precisely this reason. 406 U.S. at 431–33 & n. 22, 92 S.Ct. at 1686–88 & n. 22 ("his inability to bind the persons on whose behalf he sues undercuts the utility of his suing"); *see Gill v. Frances Investment Co.,* 19 F.2d 880, 884 (9th Cir.1927) (noteholder not bound by judgment in prior proceeding brought by the trustee because "[t]he trust deed lodged in the trustee no authority to represent the beneficiary in that proceeding," which was "wholly extraneous to his trust").

■ Moreover, the trial court correctly noted that NCB is not the proper plaintiff to bring this action because the noteholders have different interests of varying merit which cannot be adequately protected by one trustee. Indeed, the principle responsibility of the indenture trustee is to shepherd the obligation of the issuer to make payment on the notes. In this respect, the trustee serves the *common interest* of all the noteholders.

In the circumstances of this case, however, there are not common interests among the former noteholders for whose benefit NCB purportedly sues. Putting aside the fact there are no longer any

noteholders, NCB repeatedly states that it must sue for their "ratable benefit." What NCB fails to acknowledge is that many of the noteholders at the time Wickes was reorganized and the notes were surrendered had purchased their notes at a large discount after the Wickes bankruptcy proceedings began: The purchase price reflected the risks of recovery presented by the bankruptcies. Those particular noteholders in fact profited from the purchase of the note, because the bankruptcy distribution exceeded their purchase price. Any recovery by NCB here would be a windfall for those noteholders.

For this reason alone, we believe it is better to limit NCB's powers, as the indentures do, to enforcing the notes themselves and to leave to former noteholders any ancillary claims that they may have arising from the purchase, sale ،r retention of their notes. As the Supreme Court has observed, "the debenture holders, the persons truly affected by the suit * * *, should make their own assessment of the respective advantages and disadvantages, not only of litigation, but of various theories of litigation." *Caplin*, 406 U.S. at 431, 92 S.Ct. at 1687. However, as we explain below, any action by the noteholders cannot presently be maintained because of the releases executed as part of the Wickes Reorganization in the bankruptcy proceedings.

■ 2. Even if NCB had standing and were the proper plaintiff, its claims against C & L are nevertheless derivative in nature and cannot be maintained. In its complaint, NCB essentially alleges that the primary and direct effect of the alleged breach of duty by C & L was the loss of GCC's interest in the GSK receivables and, hence, a reduction in the value of GCC's bankruptcy estate. The allegations show, however, that the noteholders were injured only indirectly, like all of GCC's creditors, by a reduction in the value of the corporation's assets. Therefore, even prior to the GCC bankruptcy filing, any claims arising from the alleged misconduct of C & L belonged to GCC and could not have been maintained by NCB directly on behalf of the noteholders, a limited class of GCC creditors.

■ Once the GCC Chapter 11 petition was filed, the claims became property of the GCC estate pursuant to 11 U.S.C. § 541 and were subject to the exclusive control of the debtor-in-possession and the bankruptcy court. Here, the debtor-in-possession, without objection from NCB and with the express approval of the bankruptcy court, released the claims against C & L in return for valuable consideration to the Wickes estate that benefited all creditors, including the noteholders. That release is binding on NCB and the noteholders.

Although NCB insists that the allegations in the complaint assert a direct claim against C & L for damages and are based on a cause of action for negligence against an accountant owing a duty of care to third parties, we believe the crucial inquiry is not whether C & L owed a duty to the noteholders, but whether the injury that the noteholders allegedly suffered was direct.[1] The duty a corporate agent owes to creditors or shareholders of a corporation does not, by itself, give creditors or shareholders a direct, individual right of action against the corporate agent. *See Westgor v. Grimm*, 318 N.W.2d 56, 58 (Minn.1982). To bring a direct action, creditors must allege a direct injury to them that is separate, distinct, and not dependent upon the injury caused to the corporation. *See, e.g., Dana Molded Products, Inc. v. Brodner*, 58 B.R. 576, 580 (N.D.Ill.1986) ("creditors may not maintain an action against corporate fiduciaries where the creditor is harmed only indirectly, and has sustained an injury in common with other creditors").

In *Dana Molded Products*, a creditor of a bankrupt company sued a former officer of the defunct company and other third parties, alleging a fraudulent transfer of assets. The creditor vigorously contended that it was not bringing a derivative suit,

---

**1.** C & L conceded for purposes of the summary judgment motion that it owed a duty to NCB and the noteholders.

because it was "neither seeking recovery of [the bankrupt company's] property nor asserting a claim on [the company's] behalf." *Id.* at 579. Rather, the creditor purported to "bring suit on its own behalf for the separate injury which defendants inflicted on it." *Id.*

The court rejected the creditor's contentions because it found that:

the injuries plaintiff asserts are indistinguishable from those suffered by [the bankrupt company] itself. Indeed, it is only in its capacity as a creditor of [the bankrupt company] that plaintiff has been injured at all * * *.

*Id.* The court emphasized that the creditor's injury was due to the diminution in the bankrupt company's assets and was no different from the injuries suffered by other Chapter 11 creditors. Accordingly, the court held that the claim did not belong specifically and exclusively to the creditor. *Id.*

Similarly, the primary injury alleged here is to GCC, and the right to recover belongs to the corporation. *See Westgor*, 318 N.W.2d at 58. The noteholders' alleged injury exists only because GCC was injured, and the amount of their injury is wholly dependent on the diminution in the value of GCC's assets. This is the essence of a derivative claim. The noteholders have not sustained an identifiable loss peculiar and personal to themselves, as distinct from all other creditors and equity holders, and, accordingly, NCB cannot sue directly on their behalf. *See Ford Motor Credit Co. v. Minges*, 473 F.2d 918, 920–21 (4th Cir.1973).

Our holding is in accord with *Bonhiver v. Graff*, 311 Minn. 111, 248 N.W.2d 291 (1976), where our supreme court recognized an accountant's liability to a third party in limited circumstances. In *Bonhiver*, an accounting firm was hired to bring an insurance company's books up to date. One of the accountants made various entries in the company's books and records. In doing so, he made several errors, failing to investigate certain transactions which would have revealed the company's insolvency. Relying on the accountant's work, the Minnesota Commissioner of Insurance permitted the company to continue to operate.

Shortly thereafter, rumors began circulating that the company was insolvent. The commissioner met with several concerned parties, including an insurance agent who had become the general agent for the insurance company, and gave assurances that the company was solvent. Relying on the commissioner's assurances, the agent continued to write insurance with the company and personally advanced premiums to the company for the policies he had written. The company eventually collapsed, however, and Bonhiver, as the receiver, brought an action against the accounting firm alleging negligent misrepresentation.

The court held that the accountant and the firm were liable to the commissioner for any loss he suffered because the accountant actually knew that the commissioner was relying on his work. *Id.* at 129, 248 N.W.2d at 302. The court, however, acknowledged that the commissioner was not injured and had no interest in the matter. Rather, he was a representative whose duty it was to protect people who deal with insurance companies. The court then addressed the issue whether the insurance agent was protected by the commissioner's reliance. Under the facts presented, the court held that he was and that he could recover the premiums he had advanced to the company. *Id.*

Unlike the noteholders in the present case, the insurance agent in *Bonhiver* did not share ratably in the injury suffered by all the creditors. He suffered an identifiable loss peculiar to himself because he had advanced funds, relying on the commissioner, who in turn was relying on the accountant's representations. Here, the noteholders have not suffered a direct injury. Only in their capacity as creditors were they injured at all. Their loss is indistinguishable from the loss suffered by GCC due to the diminished value of its assets, which effect was visited on all of GCC's Chapter 11 creditors.

■ After GCC's Chapter 11 bankruptcy petition was filed, any action against the

officers or directors or outside professionals such as C & L for diminution in the assets of the corporation caused by mismanagement or negligence vested exclusively in the bankruptcy estate and could have been brought only by the debtor-in-possession or the trustee. *See In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1253–54 (5th Cir.1986).

Here, the debtor-in-possession released all claims against C & L as part of the overall settlement of the shareholder class actions, to which C & L contributed a substantial amount of money. The settlement was approved by the bankruptcy court. NCB received notice of the settlement and did not interpose any objection. The settlement conferred a substantial benefit on the Wickes and GSK estates, in which the noteholders participated. Since the claims asserted here belonged to the bankruptcy estate, the debtor-in-possession was free to release C & L, and NCB cannot now disavow the settlement.

## DECISION

The trial court properly held that appellant lacks standing and is not the proper plaintiff to bring this action and that the claims asserted are derivative and cannot be maintained.

Affirmed.