**TCF BANKING AND SAVINGS,
F.A., Plaintiff,**

v.

**ARTHUR YOUNG &
COMPANY, Defendant.**

Civ. No. 4–87–809.

United States District Court,
D. Minnesota,
Fourth Division.

April 14, 1988.

See also 697 F.Supp. 362.

Frank A. Dvorak, Stephen P. Kelley and Thomas C. Power, Mackall, Crounse & Moore, Minneapolis, Minn. (Gregory J. Pulles, TCF Banking & Savings, F.A., Corporate Banking, Minneapolis, Minn., of counsel), for plaintiff.

James S. Simonson, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., John Matson, Arthur Young, New York City, for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendant's motion to dismiss for failure to state a claim upon which relief can be granted. Defendant's motion will be granted in part and denied in part.

FACTS

Plaintiff TCF Banking and Savings, P.A. (TCF) is a stock savings and loan association chartered under federal law with a place of business in Minnesota. Defendant Arthur Young & Co. is a professional partnership of certified public accountants. In August 1984 TCF was asked by Midwest Federal Savings & Loan Association (Midwest) to participate in a $16.9 million loan to Lewis Farris, Jr. and Clint Murchison, Jr. The sole security for the loan was stock owned by Farris and Murchison in Nevada National Bancorporation (NNBC),

a one-bank holding company. Prior to agreeing to participate in the loan, TCF obtained the 1983 annual report of NNBC. The report "included a consolidated balance sheet, consolidated statements of operations, stockholders' equity, and changes in financial positions," and incorporated financial information of the Nevada National Bank (NNB), a wholly-owned subsidiary of NNBC. Complaint par. 13. Defendant Arthur Young prepared the 1983 annual report together with accompanying notes and an audit report. Complaint par. 14. TCF alleges it relied on the materials prepared by Arthur Young in deciding to participate in the Farris–Murchison loan agreement. Complaint par. 12.

On September 14, 1984 TCF extended credit in the amount of $11.4 million to Farris and Murchison; Midwest advanced an additional $5.5 million. Farris pledged 810,314 shares of NNBC stock as collateral for the entire loan and Murchison pledged an additional 732,242 shares. Under the terms of the loan agreement the principal was payable upon demand and interest was due quarterly. By December 31, 1984 Farris and Murchison were in default because of their failure to pay interest. Complaint par. 18. However, TCF and Midwest apparently attempted to work out a new payment schedule and did not immediately foreclose on the stock. When the work-out negotiations failed, they foreclosed.

At a private sale on March 25, 1986 TCF and Midwest purchased[1] the 810,314 shares pledged by Farris at a per-share price of $11.11 for a total purchase price of $9,002,589. On April 18, 1986 at a second private sale they purchased the 732,242 shares of NNBC stock pledged by Murchison also at $11.11 per share, for a total price of $8,135,209. TCF contends the purchase price of $11.11 per share was determined in reliance on the 1983 and 1984 annual reports of NNBC which were again prepared by defendant. Complaint par. 23. TCF and Midwest applied the combined purchase price of the stock to the outstand-

---

**1.** The foreclosure of the stock shares constituted a purchase within the meaning of Article 9 of the Uniform Commercial Code even though nei- ther TCF nor Midwest advanced new value for the stock. See Minn.Stat. § 336.9–504(1), (3).

ing amount of the loan obligation, resulting in cancellation of the principal indebtedness but leaving an amount of $2,470,356 due and owing as interest. In June 1987 TCF and Midwest sold the stock they had foreclosed upon at a price of $7.04 per share, for a total amount of $10,859,594, a loss of $6,278,117 from the original foreclosure price. TCF alleges that after April 1986 it learned that the 1983, 1984 and 1985 annual reports of NNBC were all materially misleading. This litigation ensued.

The complaint is in five counts. Count I alleges Arthur Young violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5. Count II alleges a violation of the Minnesota Uniform Securities Act, Minn.Stat. § 80A.01 et seq. Count III alleges a claim of common law negligence. Count IV states a claim for common law fraud and Count V alleges a claim for common law malpractice. Jurisdiction is properly invoked under 15 U.S.C. § 78aa, 28 U.S.C. § 1331 and principles of pendent jurisdiction. All five counts of the complaint are premised on the assertion that the 1983, 1984 and 1985[2] annual reports were materially false and misleading. Defendant now moves under Fed.R.Civ.P. 12(b)(6) to dismiss the complaint on the grounds that it fails to state a claim for which relief can be granted. In support of its motion defendant advances a potpourri of arguments including (1) the section 10(b) claim fails to state fraud with particularity as required by Fed.R.Civ.P. 9(b); (2) the section 10(b) claim is barred by the statute of limitations (3) the Minnesota Uniform Securities law claim is barred because defendant is not a seller of securities; (4) the Minnesota Uniform Securities law claim is barred by the statute of limitations; and (5) the state law negligence and malpractice claims must be dismissed because plaintiff cannot show that defendants actually knew that TCF would rely on the annual reports as required by state law.

## DISCUSSION

In reviewing a motion to dismiss for failure to state a claim the Court presumes all factual allegations to be true and all reasonable inferences from those allegations are construed in favor of the non-moving party. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Stephens v. Associated Dry Goods Corp.*, 805 F.2d 812, 814 (8th Cir.1986). The appropriate inquiry is not whether plaintiff will ultimately prevail but whether he will be allowed to introduce evidence to support his claims. *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686. Because dismissal on the pleadings is an extreme remedy it is not favored by the courts and is employed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957) (footnote omitted); *see Robinson v. MFA Mutual Insurance Co.*, 629 F.2d 497, 500 (8th Cir.1980).

### A. The Section 10(b) Claim

The section 10(b) claim is premised on the assertion that the defendant

engaged in, and/or aided and abetted, a plan, a scheme and unlawful conspiracy and course of conduct with NNBC, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon Plaintiff TCF and made intentionally and/or recklessly various untrue statements of material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff TCF. Defendant Arthur Young participated in this scheme with the knowledge that its purpose and effect was to induce Plaintiff TCF, MWF and others to purchase and sell NNBC stock at artificially inflated prices. Plaintiff TCF made such purchases of stock in reliance on, directly or

**2.** Only Count V, the common law malpractice claim, makes reference to the 1985 annual report. The remaining counts are all premised on

the alleged inaccuracies in the 1983 and 1984 reports.

indirectly, the untrue statements made by Defendant Arthur Young.

Complaint par. 30. In particular, the complaint identifies two specific defects with the NNBC 1983 and 1984 annual reports. First, it alleges that the 1983 and 1984 reports were false and misleading in that the allowance for credit losses of NNB (the wholly-owned subsidiary of NNBC) was far less than what the allowance should have been as determined by generally accepted accounting principles and generally accepted auditing standards. Complaint par. 15, 24. Second, it alleges that the 1983 report failed to disclose that NNB's trust department had incurred a $2 million liability which was not reflected in the financial statements of NNBC. Complaint par. 16. The plaintiff similarly criticizes the 1984 report for failing to disclose "substantial liabilities" incurred by NNB's trust department. Complaint par. 24. The complaint alleges that as a result of these omissions and misrepresentations the 1983 and 1984 reports overstated NNBC's income and assets for the years in question. Complaint par. 24. Defendant first maintains these allegations fall far short of the specificity required for pleading fraud under Fed.R. Civ.P. 9(b).

### 1. *Failure to Plead Fraud with Particularity*

Rule 9(b) of the Federal Rules of Civil Procedure provides:

> In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

The specificity requirement of rule 9(b) is a marked departure from the general simplified pleading philosophy of the federal rules. 5 C.Wright & A. Miller, *Federal Practice and Procedure* § 1297 at 405 (1969). In the context of securities litigation the rule serves three distinct purposes. First, it deters the use of complaints as a pretext for fishing expeditions of unknown wrongs designed to compel *in terrorem* settlements. Second, it protects against damage to professional reputations result-ing from allegations of moral turpitude. Third, it ensures that a defendant is given sufficient notice of the allegations against him to permit the preparation of an effective defense. *Ross v. A.H. Robins,* 607 F.2d 545, 557 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *Stewart v. Fry,* 575 F.Supp. 753, 756 (E.D.Mo.1983).

The United States Court of Appeals for the Second Circuit has strictly applied rule 9(b) in the securities fraud context as a means of deterring frivolous suits. 2A Moore's Federal Practice par. 9.03[3] at 9.51 (2d ed. 1987). *See, e.g., Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 120 (2d Cir.1982); *Quantum Overseas, N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 666–67 (S.D.N.Y.1987). In cases involving securities fraud claims against accountants, the courts in the Second Circuit have repeatedly held that mere boilerplate assertions that a particular report failed to comply with relevant auditing or accounting standards is not a sufficient allegation of fraud or recklessness; instead it is necessary to detail which standards applied and in what fashion the defendant deviated from them. *See, e.g., In Re AM International, Inc. Securities Litigation,* 606 F.Supp. 600, 606 (S.D.N.Y.1985). Other courts, however, have not followed the Second Circuit's lead and have liberally construed the requirements of rule 9(b) in the context of securities fraud claims. *See, e.g., Christidis v. First Pennsylvania Mortgage Trust,* 717 F.2d 96, 100 (3d Cir.1983) (rule 9(b) must be flexibly applied prior to discovery to prevent sophisticated defrauders from successfully concealing details of fraud); *Baden v. Craig–Hallum, Inc.,* 646 F.Supp. 483, 490 (D.Minn.1986) (compliance with rule 9(b) requires "at a minimum, the time, place, nature, and exact content of the alleged misrepresentations, along with a description of the full nature of the transaction involved"); *Shahmirzadi v. Smith Barney, Harris Upham & Co. Inc.,* 636 F.Supp. 49, 51 (D.D.C.1985) (same).

█ Defendant contends that the complaint's bald allegation that the audit reports failed to comply with applicable audit-

ing and accounting standards by understating the amount of bad debt reserves does not satisfy the requirements of rule 9(b). Plaintiff argues that only in the Second Circuit would the complaint be deemed deficient and that by alleging the specific documents involved, and time, place and manner of the fraud it has in fact complied with the requirements in this circuit. The Court notes, however, that in *Christidis,* 717 F.2d at 100, the United States Court of Appeals for the Third Circuit, which espouses a liberal view of rule 9(b), found a similar complaint deficient under rule 9(b). In *Christidis* the plaintiff alleged that certain financial statements were prepared in violation of relevant accounting standards because the amount of bad debt reserves contained in the statements fell short of the amounts which should have been allocated for bad debts. 717 F.2d at 97. The Third Circuit held the allegation was fatally defective regardless of how liberally rule 9(b) was applied:

> [The complaint's] defect is the complete absence of any disclosure of the manner in which, in establishing reserves for bad debts in the financial statements relied upon, the defendants knowingly departed from reasonable accounting practices. Those reserves were estimates or predictions of the likely collection or liquidation experience of the Trust in the future. They could be fraudulent only if, when they were established the responsible parties knew or should have known that they were derived in a manner inconsistent with reasonable accounting practices. What those practices are and how they were departed from is nowhere set forth.

*Christidis,* 717 F.2d at 100.

The Court finds the reasoning of the *Christidis* court is persuasive on the facts of this case. The establishment of a bad debt reserve involves economic forecasting, not the reporting of known facts. As the United States Court of Appeals for the Eighth Circuit has noted, "economic prognostication, though faulty, does not, with-

out more, amount to fraud." *Polin v. Conductron Corp.,* 552 F.2d 797, 805 (8th Cir.), *cert. denied,* 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977); *see also Pegasus Fund, Inc. v. Laraneta,* 617 F.2d 1335, 1340–41 (9th Cir.1980) (accountant's ordinary negligence did not give rise to section 10(b) claim). With respect to the bad debt reserves, merely pleading the time, place, and manner is insufficient to support an inference of fraud. To support their allegation that the defendant fraudulently or recklessly established an inadequate amount of bad debt reserves, plaintiff must specify which accounting or auditing standards applied and how they were violated. This defect applies not only to the Section 10(b) claim but to the common law fraud count as well.[3]

Accordingly, the Court will allow plaintiff sixty days to amend the complaint to plead what the relevant accounting and auditing standards were with respect to the bad debt reserves and how the defendant deviated from those standards. Moreover, plaintiff should also clarify whether the 1984 annual report failed to disclose other substantial liabilities in addition to those alleged.

■ Defendant also moves to dismiss the portion of plaintiff's section 10(b) claim premised on an aiding and abetting theory. The complaint alleges in relevant part that:

> Defendant Arthur Young engaged in, and/or aided and abetted, a plan, a scheme and unlawful conspiracy and course of conduct with NNBC, pursuant to which it knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud upon Plaintiff TCF and made intentionally and/or recklessly various untrue statements of material facts and omitted material facts necessary in order to make the statements made ... not misleading to Plaintiff TCF. Defendant Arthur Young participated in this scheme with the knowledge that its pur-

---

**3.** Because the Court concludes *infra,* at 1415–17 that plaintiff's subsequent foreclosures did not constitute separate sales within the meaning of the federal securities laws, the alleged defects in the 1984 and 1985 reports are of no consequence with respect to the section 10(b) claim. Those reports are, however, relevant to plaintiff's claim for common law fraud.

pose and effect was to induce plaintiff TCF, MWF and others to purchase and sell NNBC stock at artificially inflated prices.

Complaint par. 30. An aiding and abetting claim has three elements: (1) the violation of the statute by the primary party; (2) the knowledge of the aider and abettor of that primary violation; and (3) substantial assistance rendered by the aider and abettor to the primary violator in effecting the fraud. *Stokes v. Lokken*, 644 F.2d 779, 782–83 (8th Cir.1981); *Antinore v. Alexander & Alexander Services, Inc.*, 597 F.Supp. 1353 (D.Minn.1984). Rule 9(b) requires that plaintiff plead with particularly each of the elements which comprise an aiding and abetting claim. *Hagert v. Glickman, Lurie, Eiger & Co.*, 520 F.Supp. 1028, 1037 (D.Minn.1981). Subject to the caveats concerning the violation of accounting and auditing standards and unreported liabilities in the 1984 report, the Court concludes that plaintiff's aiding and abetting allegation is otherwise sufficient. *See Antinore*, 597 F.Supp. at 1359.

### 2. *Statute of Limitations*

 Defendant concedes that under current Eighth Circuit law, plaintiff's section 10(b) claim is not time barred. Because section 10(b) contains no express cause of action it also does not contain a statute of limitations. Accordingly, the United States Court of Appeals for the Eighth Circuit has specified that the statute of limitations applicable to the most closely analogous state statute applies. *Vanderboom v. Sexton*, 422 F.2d 1233, 1237–38 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). Thus, for a section 10(b) claim the appropriate limitations period is the three-year period contained in Minn.Stat. § 80A.23, subd. 7. *Applebaum v. Ceres Land Co.*, 546 F.Supp. 17, 19 (D.Minn.1981), *aff'd* 687 F.2d 261 (8th Cir.1982). In addition to applying state statute of limitations periods, however, federal tolling principles also apply. The limitations period does not begin to run, therefore, until the fraud was or should have been discovered. *Vanderboom*, 422 F.2d at 1237; *Applebaum*, 546

F.Supp. at 21. In this case the initial purchase of stock took place on September 14, 1984 and suit was filed on September 14, 1987. Defendant concedes that if traditional state statute of limitations and federal tolling principles apply then plaintiff's section 10(b) claim is not time barred.

Defendant contends, however, that in light of recent pronouncements by the United States Supreme Court, the Court should disregard existing precedent and select a limitations and tolling period that applies to section 13 of the Securities Act of 1933, 15 U.S.C. § 77m and sections 9 and 18(a) of the 1934 Act, 15 U.S.C. §§ 78i, 78r(a), as well as under a variety of other statutes such as the Public Utility Holding Company Act, 15 U.S.C. § 79p. Each of the provisions of those statutes contains a single federal limitations and tolling period consisting of one year from discovery and three years as an absolute bar regardless of discovery. Under such a rule, because plaintiff claims it discovered the fraud in April 1986 and did not file its suit until September 1987, plaintiff's suit would be time barred. Alternatively, defendant requests that the Court depart from precedent and refuse to engraft federal tolling principles onto the three-year limitations period contained in Minn.Stat. § 80A.23. Under such an approach defendant argues that plaintiff's claim would also be time barred.

As support for its argument defendant cites from a litany of courts and commentators who have criticized the hybrid approach of state statute of limitation/federal tolling rules. *See, e.g., Norris v. Wirtz*, 818 F.2d 1329, 1333 (7th Cir.) (noting practitioners and commentators agree that result of existing limitation/tolling rules for section 10(b) claims is a mess), *cert. denied*, —— U.S. ——, 108 S.Ct. 329, 98 L.Ed.2d 356 (1987); ABA Report on the Task Force on Statutes of Limitations for Implied Actions at 5–6 (Aug. 13, 1985); Block and Barton, *Statutes of Limitations in Private Actions under Section 10(b)—A Proposal for Achieving Uniformity*, 7 Sec.Reg.L.J. 374 (1980). Moreover, defendant correctly notes that the Supreme Court has been

moving away from the hybrid approach in interpreting federal statutes. *See, e.g., Board of Regents v. Tomanio,* 446 U.S. 478, 483–86, 100 S.Ct. 1790, 1794–96, 64 L.Ed.2d 440 (1980) (under 42 U.S.C. § 1983 state statute of limitations and state tolling principles apply); *Johnson v. Railway Express Agency Inc.,* 421 U.S. 454, 463–64, 95 S.Ct. 1716, 1721–22, 44 L.Ed.2d 295 (1975) (applying state statute of limitations and state tolling principles to 42 U.S.C. § 1981). Despite the sound policies militating in favor of federalizing the statute of limitations under section 10(b), or of adopting a uniform state law/state tolling approach, courts have refused to do so given direct precedent to the contrary and the absence of an invitation by the Supreme Court to do so. *See, e.g., McNeal v. Paine, Webber, Jackson, & Curtis, Inc.,* 598 F.2d 888, 892 (5th Cir.1979).

Defendant contends, however, that the Supreme Court recently extended that invitation in *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). In *Malley–Duff* the Supreme Court held that the four-year statute of limitations applicable to Clayton Act civil enforcement actions, 15 U.S.C. § 15(b) also applied to civil RICO actions, 18 U.S.C. § 1964 even though the RICO statute itself did not contain any express statute of limitations. 107 S.Ct. at 2763. The Court based its reasoning on the fact that the RICO statute subsumed a broad variety of activities denominated as "racketeering" and that therefore a uniform statute of limitations was desirable. *Malley–Duff,* 107 S.Ct. at 2763. Although the reasoning of the *Malley–Duff* decision may well be applicable here, nowhere did the *Malley–Duff* Court intimate that lower federal courts should extend its ruling to claims under section 10(b) of the 1934 Securities Act. Indeed, the *Wirtz* case cited for support by the defendant the United States Court of Appeals for the Seventh Circuit noted that "[o]nly Congress or the Supreme Court can bring uniformity and predictability to this field; we have vowed to stand pat rather than make things worse by exchanging one conflict for another." 818 F.2d at 1332. Thus, the Court declines to adopt defendant's well-researched and well-reasoned argument which ignores direct Eighth Circuit precedent to the contrary. Accordingly, the Court finds that plaintiff's section 10(b) claim is not time barred.

## B. The Minnesota Uniform Securities Act Claim

Count II of the complaint alleges defendant violated the Minnesota Uniform Securities Act, Minn.Stat. § 80A.01 which provides in relevant part:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

. . . .

(b) to make any untrue statement of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. . . .

The remedy for a violation of section 80A.01 is expressly contained in section 80A.23 subd. 2 which provides in relevant part "[a]ny person who violates section 80A.01 in connection with the purchase or sale of any security shall be liable to the person damaged thereby. . . ." Defendant moves to dismiss Count II on a number of grounds. Because the Court finds the statute of limitations argument to be dispositive, it will not address defendant's remaining arguments with respect to Count II.

Defendant argues that plaintiff's section 80A.01 is barred by the three-year statute of limitations period in Minn.Stat. § 80A.23, subd. 7 which provides in relevant part:

No person may commence an action under [Minn.Stat. 80A.23, subd. 2] more than three years after the occurrence of the act or transaction constituting the violation.

This argument is premised on the assumption that the only sale of securities involved in the underlying transaction was plaintiff's acceptance of a security interest in the NNBC stock. Defendant argues that if the initial pledge is deemed a sale then

plaintiff's foreclosure on that stock cannot constitute a second sale because plaintiff did not purchase the same stock twice. Under defendant's view, because the purchase (*i.e.*, initial pledge) occurred on September 14, 1984, plaintiff cannot claim it relied on the 1984 NNBC annual reports in connection with that purchase. The alleged misrepresentation which induced the 1984 purchase was thus defendant's 1983 audit report.[4] Because that audit report constitutes the "act or transaction constituting the violation" under Minn.Stat. 80A.23 subd. 2, and because suit was filed on September 14, 1987 more than three years later, defendant contends the section 80A.01 claim is barred by the statute of limitations.

Plaintiff argues that both of defendant's premises are incorrect. First, it argues that the initial pledge and subsequent foreclosures do constitute separate purchases of securities within the meaning of the Minnesota Uniform Securities Act. Second, it contends that the language "the act or transaction constituting the violation" does not refer to the underlying misrepresentation but rather to the sale induced by the misrepresentation.

Here, plaintiff filed suit exactly three years after the date of the initial pledge. Thus, if the statute of limitations under section 80A.23, subd. 2 begins to run from the date of sale, plaintiff argues its claim is not time barred, regardless of whether or not the later foreclosures constitute separate purchases with separate statute of limitations periods.[5] In contrast, if the limitations period begins to run from the date of misrepresentation then plaintiff's section 80A.23, subd. 2 claim is viable only if the later foreclosures are purchases within the meaning of the statute. This is because the alleged misrepresentation which induced the initial pledge (purchase) occurred more than three years prior to the time suit was filed.

Plaintiff's assertion that the language "act or transaction constituting the violation" in Minn.Stat. § 80A.23, subd. 7 refers to the date of sale cannot withstand scrutiny in light of the language of the entire subdivision:

> No person may commence an action under [Minn.Stat. § 80A.23, subd. 1] more than three years *after the sale* upon which such action is based. No person may commence an action under [Minn.Stat. § 80.23, subd. 2] more than three years after the occurrence of the act or transaction constituting the violation.

(Emphasis added.) As defendant correctly notes, the wording of the statute makes explicit that the date of sale is only the trigger date with regard to Minn.Stat. § 80A.23, subd. 1, but not with regard to Minn.Stat. § 80A.23, subd. 2 which is the subdivision involved here. Moreover, the act or transaction constituting the violation under Minn.Stat. § 80A.01 is not the purchase or sale itself, but rather the making of an untrue statement or engaging in fraud or deceit in connection with that sale. It is that event which begins the running of the statute of limitations.

Plaintiff argues that reading the statute literally creates the anomalous result that the statute of limitations on its Section 80A.01 claim began to run before its cause of action actually accrues, because it only had a viable cause of action after the consummation of the allegedly fraudulently induced sale. While the Court is sympathetic to this argument, the inescapable fact is that the statutory language is unambiguous and therefore must be presumed to reflect the intent of the Minnesota legislature. *See, e.g., Kopperud v. Agers*, 312 N.W.2d 443 (Minn.1981) (construing failure of legislature to incorporate tolling principles in state blue-sky law as intention that such tolling principles not apply at all).

---

4. It is not clear from the record on what date the defendant published the 1983 annual report. It is clear, however, that that occurred more than three years before September 14, 1987, the date this action was commenced.

5. Defendant in a footnote, suggests without citing any supporting authority, that if the date of sale is the first day of the limitations period plaintiff's claim might still be time barred. The Court intimates no view on the correctness of this argument.

Accordingly, plaintiff's claim under section 80A.01 of the Minnesota Uniform Securities Act with respect to the 1983 audit report is barred by the statute of limitations.

■ A more complicated issue exists with regard to whether plaintiff's subsequent foreclosures on the NNBC stock constitute separate sales of securities within the meaning of section 80A.01. If they do, plaintiff could maintain its section 80A.01 claim based on the alleged misrepresentation contained in the 1984 annual report without running afoul of the statute of limitations. If they do not plaintiff's entire claim under section 80A.23, subd. 2 rests on the 1983 report and is thus time barred. Certainly, foreclosure on a security interest constitutes a disposition of a security interest within the meaning of § 80A.01. Indeed, there is no doubt that the foreclosure constituted a sale within the meaning of the Minnesota Uniform Commercial Code. *See* Minn.Stat. § 336.9-504(1), (3). Moreover, a long line of cases have expressly held that a defaulting pledgor of stock has standing as a seller of securities when the pledgor's stock is sold to pay off the loan against which the stock was pledged. *See, e.g., Madison Consultants v. Federal Deposit Ins. Corp.,* 710 F.2d 57, 61 (2d Cir. 1983); *Eastwood v. National Bank of Commerce,* 673 F.Supp. 1068, 1071 (W.D. Okl.1987); *Cambridge Capital Corp. v. Northwestern National Bank,* 350 F.Supp. 829, 833 (D.Minn.1972). These cases obviously support the conclusion that the pledgee who forecloses is therefore a purchaser. *See Lincoln National Bank v. Lampe,* 414 F.Supp. 1270, 1278 (N.D.Ill. 1976) ("where collateral is foreclosed, the lender has in effect made a forced purchase of the collateral for the amount lent").

Defendant correctly notes, however, that no case has ever held that the initial pledge and subsequent foreclosure each can constitute a separate purchase under the federal securities laws. Defendant argues that a lender who "purchases" stock through a pledge should not be treated differently under the securities laws than a lender who purchases the stock outright.

Concluding that the pledge and the foreclosure constitute separate sales would produce that result by allowing the "pledging" lender to purchase the same shares twice, defendant contends.

From a transactional standpoint defendant's argument has considerable merit. A stock pledge is a bailment of stock to secure a loan or other obligation. The pledgor transfers possession but not title to the pledgee, who obtains a security interest in the stock. By retaining title, the pledgor retains the right to vote, the right to receive dividends, and the obligation to pay any applicable taxes on the stock. In the event the obligation is fully paid off, the security interest is extinguished. In contrast, if the pledgor defaults on the underlying obligation, the pledgee can foreclose. *See generally,* Comment, *Expanding Antifraud Protection: The Pledge of Stock Under Sections 17(a) and 10(b) of the Securities Acts,* 15 JOHN MARSH.L.REV. 439, 440 (1982). Foreclosure results in the title to the stock passing to the pledgee, and a concomitant reduction in the pledgor's underlying obligation after liquidation. *Lampe,* 414 F.Supp. 1270. By foreclosing, however, the pledgee does not acquire title to the same stock twice or risk a different block of capital; foreclosure merely represents the "realization" of the pledgee's inchoate property interest in the pledged stock.

It is now well established that a pledge constitutes a sale of securities under the federal securities laws. *Marine Bank v. Weaver,* 455 U.S. 551, 554 n. 2, 102 S.Ct. 1220, 1220 n. 2, 71 L.Ed.2d 409 (1982); *Rubin v. United States,* 449 U.S. 424, 429–30, 101 S.Ct. 698, 701–02, 66 L.Ed.2d 633 (1981); *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 940–41 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Prior to *Rubin,* appellate courts had been split on whether or not a simple pledge, absent foreclosure, could constitute a purchase within the meaning of the federal securities laws. *Compare McClure v. First National Bank,* 497 F.2d 490, 495–96 (5th Cir.1974) (holding bank's mere acceptance of stock pledge was not sale, but suggesting it would constitute

sale in the event the bank foreclosed), *cert. denied,* 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975) *and Lincoln National Bank v. Herber,* 604 F.2d 1038, 1044 (7th Cir.1979) (concluding that initial pledge could not constitute sale although later foreclosure might) *with United States v. Gentile,* 530 F.2d 461, 467 n. 6 (2d Cir.1976) (characterization of pledge should not depend on subsequent events), *cert. denied,* 426 U.S. 936, 96 S.Ct. 2651, 49 L.Ed.2d 388 (1976).

In *Rubin* the Supreme Court concluded that passage of title was not the crucial indicia of whether or not a sale had occurred:

> The economic considerations and realities present when a lender parts with value and accepts securities as collateral security for a loan are similar in important respect to the risk an investor undertakes when purchasing shares. Both are relying on the value of the securities themselves, and both must be able to depend on the representations made by the transferor of the securities, regardless of whether the transferor passes full title or only a conditional and defeasible interest to secure repayment of a loan.

449 U.S. at 431, 101 S.Ct. at 702. Accordingly, the *Rubin* Court held a pledge was a sale. 449 U.S. at 431, 101 S.Ct. at 702. Significantly, language in *Rubin* indicates that in defining the initial pledge as a sale the Court incorporated into that definition the later possibility of foreclosure. The Court reasoned that although a pledge did not transfer absolute title, it did transfer an interest in a security because it "contemplated a self-executing procedure under a power that could, at the option of the pledgee (the bank) in the event of a default, vest absolute title and ownership." *Rubin,* 449 U.S. at 429, 101 S.Ct. at 701. *See also, Securities Investor Protection Corp. v. Vigman,* 803 F.2d 1513, 1518 (9th Cir.1986) (pledge is sale "even though no foreclosure has taken place"). This language strongly supports defendant's position. Moreover,

it is apparent that the *Rubin* Court sought to place the pledgee on equal standing with a normal investor who purchased the shares outright. Plaintiff seeks to have pledgees treated more favorably under the securities laws by deeming them to be "dual purchasers" in the event of foreclosure. The Court declines to do so. Accordingly, the Court will dismiss Count II of the complaint in its entirety.

**C. Common Law Malpractice and Negligence Claims**

■ Defendant also moves to dismiss the negligence (Count III) and professional malpractice (Count V) claims on the grounds that defendant owed no duty to plaintiff with regard to its role in reviewing the NNBC financial statements. Courts have employed three different rules on the issue of liability of accountants to third parties for negligent audits upon which those third parties relied.[6] The first approach, exemplified by Chief Judge Cardozo's opinion in *Ultramares Corp. v. Touche,* 255 N.Y. 170, 174 N.E. 441 (1931) is that accountants are only liable to those with whom the accountant is in privity. *See, e.g., Robertson v. White,* 633 F.Supp. 954, 970–71 (W.D.Ark.1986) (adopting *Ultramares* rule under Arkansas law). In narrowly construing an accountant's duties to third parties Cardozo wrote:

> [i]f liability for negligence exists, a thoughtless slip or blunder, the failure to detect a theft or forgery beneath the cover of deceptive entries, may expose accountants to a liability in an indeterminate amount, for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences.

*Ultramares,* 174 N.E. at 444. At the opposite extreme is the approach adopted by the New Jersey Supreme Court in *H. Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d

---

6. The issue with respect to both the negligence claim and the malpractice claim is the same: did the accountant owe a duty to the plaintiff? *See Bonhiver v. Graff,* 248 N.W.2d at 303; *H.*

*Rosenblum, Inc. v. Adler,* 93 N.J. 324, 461 A.2d 138, 142 (1983) (malpractice claim against auditor is essentially grounded in a theory of negligent misrepresentation).

138 (1983) that accountants owe a duty to all foreseeable users of audits who in fact rely on the audits to their detriment. Proponents of the *Adler* approach contend it both serves "the dual functions of compensation for injury and deterrence of negligent conduct" and represents a fair judicial policy by imposing the same test for determining negligence liability as in other contexts. Wiener, *Common Law Liability of the Certified Public Accountant for Negligent Misrepresentation,* 20 SAN DIEGO L.REV. 233, 260 (1983). Finally, a number of courts have adopted the compromise approach adopted in section 552 of the Restatement (Second) of Torts which stakes a middle ground between the strict privity rule in *Ultramares* and the unlimited foreseeability rule adopted by other courts. *See, e.g., Badische Corp. v. Caylor,* 257 Ga. 131, 356 S.E.2d 198, 200 (1987). Section 552 imposes a duty on accountants (a) to third parties which the accountant intends, or knows the client intends to supply with information, *or* (b) to a limited group of unknown third parties injured in reliance on the audit in a transaction which the accountant intended to influence by its audit, or knew that its client intended to influence by the audit. Thus, in addition to known users, the Restatement rule extends the accountant's duty to "a limited number of third parties who are expected to gain access to the financial statement information in an expected transaction." Note, *Accountant's Liability for Compilation and Review Engagements,* 60 TEX.L.REV. 759, 777 (1982).

In *Bonhiver v. Graff,* 311 Minn. 111, 248 N.W.2d 291, 303 (1976) the Minnesota Supreme Court approved of the Restatement approach but left undefined the precise contours of the rule it was adopting. *See Bonhiver,* 248 N.W. at 303 ("[w]herever the line will eventually be drawn between those who can recover from the negligent accountant and those who cannot, we feel that on the facts of this case [plaintiff] falls on the side of those who can recover"). *Bonhiver* involved a "most unusual" set of facts. 248 N.W.2d at 298. A Minnesota insurance company hired a Chicago firm of certified public accountants to bring its books up to date as of June 30, 1964. The firm had previously inspected the books of the company's predecessors and found them to be "impaired." This time, an accountant from the firm inspected and made entries in the books and prepared work papers during the course of his work. During the same period the Minnesota Commissioner of Insurance sent a team of examiners to examine the books of the insurance company. Pursuant to standard practice the examiners reasonably relied upon the accountant's work in their examination. Based on this reliance the examiners concluded the insurance company was solvent. In fact, the insurance company was insolvent because its owners had embezzled more than $2 million from the company. It was later determined at trial that the accountant had negligently failed to discover the fraud. It was also undisputed that had the commissioner discovered the fact of the company's insolvency, he would have taken steps to prevent the company's continued operation.

Subsequent to the commissioner's inspection, rumors began circulating in the industry that the company was insolvent. The commissioner met with several concerned parties and personally assured them of the company's solvency. One of those parties was an insurance broker who continued to place policies with the company while the owners continued to embezzle funds. Protracted multi-party litigation ensued after the fraud was discovered. The *Bonhiver* court concluded that the accounting firm owed a duty of care to the insurance broker who had personally relied upon the commissioner's representation of solvency. 248 N.W.2d at 303. The court noted that the commissioner's role was as a representative and protector of certain classes of people who dealt with insurance companies. *Bonhiver,* 248 N.W.2d at 302. It reasoned that the firm knew the commissioner, in his representative capacity, was relying on the work product of their accountant. The court further concluded that the insurance broker fell within the class of persons who should be protected by the commissioner's reliance and that he in fact had reasonably

relied upon the commissioner's representations. *Bonhiver*, 248 N.W.2d at 303.

Defendant contends that *Bonhiver* requires that the accountant have actual knowledge of the plaintiff's reliance on the accountant's representations as a predicate to liability. Because defendant first audited NNBC in 1983, and plaintiff was only asked to become involved in the financing of NNBC in August 1984, plaintiff cannot prove actual knowledge on defendant's part that TCF would rely on its representations contained in the financial statement, defendant argues. This argument is misplaced. First, nowhere does *Bonhiver* explicitly require actual knowledge of reliance by a particular plaintiff. Indeed, the *Bonhiver* court, as noted above, explicitly refrained from deciding the outer contours of accountant liability. *See* 248 N.W.2d at 303 ("[w]herever the line will eventually be drawn ..."). Moreover, in adopting the Restatement rule the *Bonhiver* court at least implied that an accountant could be liable if it knew its work was going to be used to influence a given transaction of which it had knowledge. *See* Restatement (Second) of Torts § 552(b).

Defendant's citation to *National City Bank v. Coopers & Lybrand*, 409 N.W.2d 862, 869 (Minn.Ct.App.1987) is unavailing. Nothing in that case changed the scope of the *Bonhiver* decision, nor did the Minnesota Court of Appeals attempt to do so. Indeed, in *Florenzano v. Olson*, 387 N.W.2d 168, 179 n. 3 (Minn.1986) the Minnesota Supreme Court indicated in a footnote that the *Bonhiver* case adopted Section 552 of the Restatement.

Thus, plaintiff need not prove defendant's actual knowledge of plaintiff's reliance on its audit and financial statements to prove its malpractice claim. With regard to the initial pledge plaintiff need only show either (1) that defendant intended to induce creditors to loan money to Farris and Murchison in exchange for a security interest in NNBC stock; or (2) that defendant knew its client would use the audit and financial statements to induce creditors to loan money to Farris and Murchison in exchange for NNBC stock. *See, e.g., Badische*, 356 S.E.2d at 200 ("[i]f it can be shown that the representation was made for the purpose of inducing third parties to rely and act upon the reliance, then liability to the third party can attach"). With regard to subsequent foreclosures of stock, plaintiff must prove (1) that defendant intended to influence the valuation of the stock at the foreclosure sale; or (2) that the defendant knew its client would use the audit and financial statements to influence the valuation of the stock at the foreclosure sale. These issues can appropriately be resolved after discovery in a summary judgment motion.

Based on the foregoing, and upon review of all the files, records, proceedings and arguments of counsel

IT IS ORDERED that

1. defendant's motion to dismiss Count I and Count IV for failure to plead fraud with particularity is granted in part; plaintiff has 60 days from the date of entry of this order to amend those counts as detailed in the Court's memorandum;

2. defendant's motion to dismiss Count I of the complaint because of the expiration of the statute of limitations is denied;

3. defendant's motion to dismiss Count II of the complaint because of the expiration of the statute of limitations is granted; and

4. defendant's motion to dismiss Counts III and V of the complaint is denied.