**UNION SAVINGS AMERICAN LIFE INSURANCE COMPANY, Plaintiff,**

**v.**

**NORTH CENTRAL LIFE INSURANCE COMPANY and Financial Life and Annuity Insurance Company, Defendants.**

**Civ. A. No. S89–0435 (M).**

United States District Court, S.D. Mississippi, S.D.

Feb. 2, 1993.

---

Thomas E. Vaughn, Vaughn & Associates, Gulfport, MS, for Union Sav. American Life Ins. Co.

Alan W. Perry and Janet McMurtray, Forman, Perry, Watkins & Krutz, Jackson, MS, for North Cent. Life Ins. Co.

**484**

### ORDER AND REASONS

MITCHELL, Senior District Judge.

#### A. Introduction

This action arises out of a "fronting" arrangement between Union Savings American Life Insurance Company of Pascagoula, Mississippi [hereinafter "USA Life"] and North Central Life Insurance Company of Saint Paul, Minnesota [hereinafter "NCL"] and its wholly-owned subsidiary, Financial Life and Annuity Insurance Company (an Arizona corporation) [hereinafter "FLA"] for the sale of credit life insurance. A fronting arrangement is a reinsurance device used by a company, not qualified or licensed to do business in a particular state, to profit from the sale of insurance in that state. NCL, the qualified or "fronting" company in this case, agreed to sell its insurance to accounts identified by USA Life in the states of Louisiana, Tennessee, Georgia and later Florida. The risk associated with this credit life business was then reinsured to USA Life for a ceding fee. USA Life agreed to assume the risk of any claims, and in return, received most of the premiums paid on the policies it administrated.

USA Life complains that NCL undermined its business relationship with its two primary customers: First Capital Mortgage of Birmingham, Alabama ["First Capital"], and Landmark Mortgage of Gretna, Louisiana ["Landmark Mortgage"]. USA Life alleges that an agent for NCL approached these mortgage bankers and proposed direct contract arrangements, which would eliminate the role of USA Life as reinsurer of the NCL policies these institutions sold to their individual customers. USA Life maintains that as a result of NCL's captive company proposal, business relationships which USA Life spent years developing have been destroyed.

USA Life seeks actual and punitive damages in tort and for breach of contract. The complaint alleges six separate causes of action: (1) breach of express contract between USA Life and NCL; (2) breach of

an implied covenant of good faith and fair dealing; (3) tortious interference with the contractual and business relations of USA Life; (4) conversion of USA Life's business; (5) fraud, and (6) breach of fiduciary duty.

Defendants now move for summary judgment on each of plaintiff's claims. For the following reasons, we grant partial summary judgment in favor of the defendants on the following claims: Breach of express contract between USA Life and NCL, breach of an implied duty of good faith and fair dealing, conversion of USA Life's business, fraud, breach of fiduciary duty, and tortious interference with USA Life's contractual or business relationship with Landmark Mortgage Company; summary judgment is denied regarding plaintiff's claim of tortious interference with USA Life's contractual or business relationship with First Capital Mortgage Company.

#### B. Factual Background

On November 29, 1988, USA Life and the defendants entered into two contracts: (1) a Reinsurance Agreement, and (2) a Credit Insurance Administration Agreement [hereinafter "Administration Agreement"]. Under the Reinsurance Agreement, FLA, NCL's subsidiary, ceded to USA Life "a designated portion of NCL's liability under certain policies of group and individual credit life insurance." (Reinsurance Agreement, Art. I). Under the Administration Agreement, NCL appointed USA Life to administrate "creditor accounts associated with [USA Life], ... which have contracted with NCL for group and/or individual credit life insurance policies ... in the states of Louisiana, Tennessee, and Georgia," and later Florida.[1] (Amendment Agreement ¶ 2(A)). It is undisputed that from November 29, 1988, to June 30, 1989, USA Life submitted information on the following First Capital and Landmark Mortgage locations to which NCL assigned group policy numbers: (1) First Capital—

---

1. NCL expanded USA Life's territorial limitations to include Florida by amendment effective March 25, 1989.

Nashville, Tennessee, group policy number 87–8500 [hereinafter "First Capital of Nashville"]; (2) First Capital Mortgage—Columbus, Georgia, group policy number 64–4900 [hereinafter "First Capital of Columbus"]; (3) American Mortgage Company—Shreveport, Louisiana, group policy number 84–4900 [hereinafter "American Mortgage of Shreveport"]; and (4) Landmark Mortgage Company—Gretna, Louisiana, group policy number 84–4901.

Although neither the Administration Agreement nor the Reinsurance Agreement contains an express covenant not to compete, it is undisputed that some time after the execution of the original contracts, an NCL officer did provide USA Life with a proposed "Amendment Agreement" which offered the plaintiff protection for those creditor accounts that it was actually reinsuring through NCL. (Letter of First Capital General Counsel, Frank McCarthy, Jr., to Kent Higdon, dated March 23, 1989). In April 1989, Bert Watts, an agent with JBM, Inc. (another "Administrator" and general agent for NCL), contacted both First Capital and Landmark Mortgage and proposed a captive company arrangement through which the mortgage bankers would deal directly with NCL and act as their own reinsurers. Landmark Mortgage was not interested in Watts' captive proposal and NCL made no direct contract with any office Landmark Mortgage. (Deposition of Jack DiFranco, President of Landmark Mortgage, at 18–19) However, First Capital was interested in the proposal, as it appeared that use of a captive company would greatly increase its profits from the credit life insurance business. (Deposition of Tim King, President of First Capital, at 30) Shortly thereafter, USA Life became aware of NCL's negotiations with its customers and filed this suit. On June 30, 1989, NCL exercised its right under the Administration Agreement to terminate its business relationship "at any time upon thirty (30) days written notice to the other party." (Administration Agreement ¶ 9; Reinsurance Agreement, Art. XII)[2] NCL continued to credit to USA

Life the premiums it received from First Capital of Nashville, First Capital of Columbus, and First Capital's subsidiary, American Mortgage of Shreveport, until First Capital ceased doing business with NCL sometime between September and December, 1989. (King Dep. at 40–41; Vandergrift Dep. at 17, 26–27) Similarly, NCL did not open any new Landmark Mortgage accounts after termination of its Reinsurance Agreement with USA Life became effective on July 30, 1989. (DiFranco Dep. at 18–19)

## C. Summary Judgment Standard

■ Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment after adequate time for discovery, and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corporation v. Catrett,* 477 U.S. 317, 321–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Moore v. Mississippi Valley State University,* 871 F.2d 545, 549–50 (5th Cir.1989).

## D. Choice of Law

■ Sitting in diversity, we are required under *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) to follow the choice of law rules of the forum state to decide which state substantive law to apply. Mississippi's choice of law rules direct that, in the absence of an effective choice of law by the parties, the substantive rule of decision is supplied by the law of the state which has the most substantial contacts with the parties and the cause of action. *Young By And Through Brown v. United States Fidelity & Guaranty Ins. Co.,* 786 F.Supp. 600, 603 (S.D.Miss.1991) (*citing Boardman v. United Service Auto. Ass'n,* 470 So.2d 1024 (Miss.1985)). Thus,

---

**2.** We note that Amendment Agreement, ¶ 4, *infra* note 4, clearly states that the Reinsurance Agreement and Administration Agreement terminate simultaneously.

as in this case, the law of a single state does not necessarily control every issue in a given controversy. *Boardman,* 470 So.2d at 1031. Because we find that the parties effectively elected Minnesota law to govern disputes concerning the construction of and performance under their contracts (Amendment Agreement ¶ 11),[3] we now decide the viability of plaintiff's claims for breach of express contract, breach of implied covenant of good faith and fair dealing, and breach of fiduciary duty under the substantive law of that jurisdiction.

### E. Count One: Breach of Express Contract Claim

Plaintiff USA Life claims that defendant NCL breached the express terms of a non-compete clause contained in the Administration Agreement which governed their fronting arrangement. (Complaint ¶ VII) USA Life asserts that the terms of the Amendment Agreement prohibited NCL from directly *contacting* any policy holders generated by USA Life or its agents. (Complaint ¶¶ V, VI) Such an interpretation is not supported by the actual language of the contract.

■ NCL claims that it never received a reply letter nor an executed copy of the Amendment Agreement, and that USA Life for the first time produced a signed copy of the agreement on December 18, 1990, at the deposition of Kent Higdon, former Vice-president and part-owner of USA Life. NCL denies ever executing this Amendment Agreement or approving the accounts Hidgon listed on schedule A attached to that proposed agreement. Accordingly, NCL disputes the effectiveness and enforceability of this document. Nevertheless, assuming for the purpose of deciding

defendants' motion that the terms of the Amendment Agreement are effective, NCL is entitled to summary judgment based on the clear and unambiguous language of that document. Whether a contract is incomplete or its terms ambiguous is a preliminary question of law for the court to decide. *Trondson v. Janikula,* 458 N.W.2d 679, 681 (Minn.1990); *City of Virginia v. Northland Office Properties Ltd. Partnership,* 465 N.W.2d 424, 427 (Minn. App.1991), *pet. for rev. denied* (Apr. 18, 1991); *Blackburn, Nickels & Smith, Inc. v. Erickson,* 366 N.W.2d 640, 643 (Minn. App.), *pet. for rev. denied* (June 24, 1985). Furthermore, if no ambiguity exists, interpretation of the contract and its legal effect are questions of law. *City of Virginia,* 465 N.W.2d at 427; *Erickson,* 366 N.W.2d at 643.

■ " 'A contract is ambiguous if it is *reasonably* susceptible to more than one construction.' " *City of Virginia,* 465 N.W.2d at 427 (*citing Erickson,* 366 N.W.2d at 643) (emphasis supplied); *Columbia Heights Motors, Inc. v. Allstate Ins. Co.,* 275 N.W.2d 32, 34 (Minn.1979). Paragraph Four of the Amendment Agreement states on its face that defendants *"shall not contract* with any of the creditor accounts whose credit insurance is reinsured" by USA Life.[4] The language of that provision is unambiguous and must be given its plain and ordinary meaning. *Hubred v. Control Data Corp.,* 442 N.W.2d 308, 310–11 (Minn.1989). Paragraph Five of the Amendment Agreement provides that *USA Life is a non-exclusive administrator for NCL,* and that NCL may have other general agents offering NCL insurance in states where USA Life is performing for NCL. That provision specifically

3. Paragraph 11 of the Administration Agreement provides in relevant part:

This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota. If any provision is held void, inoperative or unlawful, the remainder of the contract shall continue in full force and effect.

4. Paragraph 4 of the Amendment Agreement provides in full text:

NCL and [FLA] agree that during the term of the Reinsurance and Administration Agreements and for a period of three months after the termination of those agreements (both which shall terminate simultaneously), they shall not contract with any of the creditor accounts whose credit insurance is reinsured under the Reinsurance Agreement and who are listed on Exhibit A attached hereto and made a part hereof. Additional creditor accounts may be added to Exhibit A with the written consent of NCL.

states that those "general agents may attempt to solicit accounts whose business is reinsured under the Reinsurance Agreement" between NCL and USA Life.[5] Thus, the contract cannot be reasonably read as a whole to support plaintiff's interpretation that NCL was prohibited from even *contacting* creditor accounts.

 The parties also disagree over the meaning of the term "creditor account". However, a mere dispute regarding the parties' interpretation of a term is not sufficient to make an agreement ambiguous. *Noreen v. Park Constr. Co.*, 255 Minn. 187, 96 N.W.2d 33, 36 (1959). Moreover, a purported ambiguity does not automatically raise an issue of material fact. For an unresolved ambiguity to constitute a genuine factual issue, the record as a whole must permit a rational trier of fact to find for the nonmoving party. *Realex Chemical Corp. v. S.C. Johnson & Son, Inc.*, 849 F.2d 299, 302 (8th Cir.1988) (*citing Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). Thus, where the relevant language would limit the range of inferences a fact finder could draw and the record shows no factual basis under which the nonmoving party could prevail on the disputed issue, there are no material factual issues to preclude summary judgment. *Id.; accord Matsushita*, 475 U.S. at 588–89, 106 S.Ct. at 1357.

 . The term "creditor account" is not separately defined in any of the three contracts governing the parties' fronting arrangement. Nevertheless, we find that the term creditor account is reasonably susceptible to only one meaning based on the plain and unambiguous language of those instruments. Under the Reinsurance Agreement, FLA, NCL's subsidiary, ceded to USA Life "a designated portion of NCL's liability under *certain policies of group and individual credit life insurance.*" (Reinsurance Agreement, Art. I) (emphasis added). Paragraph 2(A) of the Administration Agreement unambiguously identifies a "creditor account" with those ceded policies. That provision expressly states that NCL appointed USA Life to administrate "creditor accounts associated with [USA Life], ... *which have contracted with NCL for group and/or individual credit life insurance policies* ... in the states of Louisiana, Tennessee, and Georgia," and whose business was being reinsured through the NCL–USA Life reinsurance agreement.[6] Similarly, the disputed Amendment Agreement only prohibits NCL from contracting with *holders of group or individual NCL policies reinsured by USA Life* under the Reinsurance Agreement.[7]

USA Life contends that First Capital's thirteen branch offices, located in seven states,[8] all fall under a single "creditor account" within the meaning of the Admin-

---

**5.** Paragraph Five of the Amendment Agreement provides in full text:

Administrator acknowledges that it is a non-exclusive administrator for NCL and that NCL may have other general agents and/or administrators offering its products in the states where the Administrator is performing for NCL, which general agents may attempt to solicit accounts whose business is reinsured under the Reinsurance Agreement. In such an event, NCL shall inform the other general agent or administrator that such account is writing business with the Administrator and that NCL will not accept any business from those accounts through any general agent or administrator other than the Administrator.

**6.** Paragraph 2(A) of the Administration Agreement provides in relevant part:

In consideration of NCL reinsuring certain credit life insurance sold by *creditor accounts*

*associated with Administrator* [USA Life] to [USA Life], Administrator shall administer NCL's credit insurance produced by those accounts pursuant to this agreement. NCL hereby appoints Administrator as its administrator for the purposes of servicing *those creditor accounts which have contracted with NCL* for group and/or individual credit life insurance policies (hereinafter "Accounts") and the issuing of certificates under such policies in the states of Louisiana, Tennessee and Georgia. (emphasis added)

**7.** "... [NCL and FLA] ... shall not contract with any of the creditor accounts whose credit insurance is reinsured under the Reinsurance Agreement...." See *supra*, note 2, Amendment Agreement ¶ 4 (full text).

**8.** First Capital has offices in the states of Alabama, Georgia, Tennessee, Mississippi and Louisiana.

istration Agreement. Similarly, USA Life argues that Landmark Mortgage's twelve offices in six states [9] constitute a single creditor account under the parties' contracts.

Although Kent Higdon and USA Life may like to consider the First Capital and Landmark Mortgage as exclusive "customers" of USA Life, we find that the record as a whole would not permit a rational trier of fact to accept USA Life's interpretation of the term "creditor account". King testified at deposition that "because of the instability in the insurance business in general, it's not uncommon to do business with a number of different insurance companies.... [First Capital] could be doing business with Kent Higdon and NCL and two or three other insurance companies and giving them not all the business, but cutting it up in little pieces." (King Dep. at 40–41) Indeed, King explained that prior to NCL's involvement: First Capital's Alabama offices offered Financial Assurance Corporation credit life insurance; First Capital agents in Mississippi sold coverage directly insured by USA Life; and First Capital agents in Georgia, Tennessee, and Louisiana sold credit life insurance underwritten by Life Investors. (King Dep. at 50–51).

Defendant argues that it would have been impossible to treat the business generated by offices in different states as falling under a single creditor account. This proposition is strongly supported by the deposition testimony of DiFranco and King. Both confirmed that premiums and commission rates, as well as policy provisions, vary from state to state. (DiFranco Dep. at 11; King Dep. at 42). We also note that the record contains evidence that the parties did in fact treat each branch office as a separate creditor account, including: an executed insurance credit agreement between NCL and Landmark Mortgage Company of Gretna, Louisiana; similar insurance credit agreements identifying four separate creditor accounts, which USA Life failed to return executed by the appropriate branch

offices; and three separate NCL group insurance policy requests submitted by USA Life for two offices of First Capital and the American Mortgage office in Shreveport, Louisiana.

Since the contracts are unambiguous, we must determine the parties' intent from the language used. *Metropolitan Sports Facilities Comm'n v. General Mills, Inc.*, 470 N.W.2d 118, 123 (Minn.1991). "Intent is ascertained, not by a process of dissection in which words and phrases are isolated from their context, but rather from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract as a whole." *Republican National Life Insurance Co. v. Lorraine Realty Corp.*, 279 N.W.2d 349, 354 (Minn.1979). Therefore, we find that the disagreement concerning the interpretation of the term "creditor account" is insufficient to raise an issue of material fact. The plain and unambiguous language of the contracts identifies "creditor accounts" with *holders of group or individual NCL policies reinsured by USA Life under the parties' Reinsurance Agreement.*

■ Furthermore, USA Life may not alter the contracts' unequivocal language with speculation regarding its unexpressed intent to exclude NCL from selling credit life insurance policies to First Capital or Landmark Mortgage except through Kent Higdon or USA Life. *General Mills, Inc.*, 470 N.W.2d at 123. Paragraph Eleven of the Administration Agreement provides in part: "This Agreement contains the entire contract between the parties, and may not be modified except in writing signed by the Administrator and an authorized officer of NCL. No oral promises or representations shall be binding." [hereinafter "Integration Clause"] We find no reason to separate this language from its obvious and intended effect. Thus, the plain language of this Integration Clause clearly precludes consideration of Higdon's testi-

---

**9.** Landmark Mortgage has offices in Florida, Alabama, Georgia, Mississippi, Tennessee and Louisiana.

mony that NCL orally agreed to a non-compete contract contemporaneously with or prior to entering into the Administration Agreement. *Material Movers, Inc. v. Hill,* 316 N.W.2d 13, 17 (Minn.1982) (parol evidence ordinarily inadmissible to vary written contract terms); *Flynn v. Sawyer,* 272 N.W.2d 904, 907–08 (Minn.1978) (same). Similarly, any discussions or negotiations leading up to the formation of the Amendment Agreement merge with that agreement.

For these reasons, we conclude as a matter of law, that the parties agreement only prohibited NCL from *contracting* with those creditor accounts, which had contracted with NCL for group or individual credit life insurance policies reinsured by USA Life under the Reinsurance Agreement, during the term of the Reinsurance and Administration Agreements and for a period of three months after termination of those agreements. (Amendment Agreement ¶ 4) Additionally, we conclude that under the terms of the agreement, NCL was prohibited from accepting from its other general agents or administrators any business sold by creditor accounts, reinsured under the Reinsurance Agreement with USA Life, for a period of three months after the termination of that agreement. (Amendment Agreement ¶ 5) Specifically, we find that the credit life insurance business protected under the Amendment Agreement is limited to First Capital of Nashville (group policy no. 87–8500), First Capital Mortgage of Columbus (group policy no. 64–4900), American Mortgage Company of Shreveport (group policy no. 84–4900), and Landmark Mortgage (group policy no. 84–4901).

The record clearly indicates that NCL honored its obligation to USA Life under the terms of the Amendment Agreement regarding these creditor accounts. In April 1989, when another NCL general agent, Bert Watts, contacted both First Capital and Landmark Mortgage and offered an arrangement through which the mortgage bankers would act as their own reinsurers, Landmark Mortgage was not interested in the Watts' captive company proposal. Additionally, NCL made no direct reinsurance contract with any Landmark Mortgage office. (DiFranco Dep. at 18–19) Although First Capital agreed to the captive proposal, deposition testimony of two of its officers reveals that the proposed captive company was never formed and that First Capital never entered into a written reinsurance agreement with NCL. (King Dep. at 37–41; Vandergrift Dep. at 23–24) Additionally, as noted above, the premiums of the two First Capital accounts and the American Mortgage account [10] continued to be credited to USA Life for the period proscribed by the Amendment Agreement, despite First Capital's consternation over the exclusion of these accounts from the proposed captive company arrangement. (King Dep. at 61; Moors Aff. Ex. A, B, C, E) Therefore, we find that USA Life has failed to produce evidence sufficient to support its contention that NCL breached the terms of the disputed Amendment Agreement. Accordingly, we grant partial summary judgment in favor of the defendants on plaintiff's claim for breach of express contract.

**F. Counts Two and Six: Breach of Implied Covenant of Good Faith and Fair Dealing and Breach of Fiduciary Duty**

Under Minnesota law, every non-sales contract contains an implied covenant of good faith and fair dealing which requires that one party not make the other's performance impossible. *See, e.g., American Warehousing v. Michael Ede Mgmt.,* 414 N.W.2d 554, 557 (Minn.App.1987); *Wild v. Rarig,* 302 Minn. 419, 234 N.W.2d 775, 790 (1975), *cert. denied,* 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). Under the terms of the parties' agreement, "either party may terminate th[e] Agreement at any time upon thirty (30) days written notice to the other party." (Administration Agreement ¶ 9) USA Life does not claim that NCL made performance un-

---

**10.** American Mortgage Company of Shreveport is wholly owned by Tim King, President of First Capital.

der their Reinsurance Agreement impossible when NCL exercised this right of termination.[11] Defendants, not plaintiff, raise the issue of whether the implied covenant of good faith and fair dealing invalidates this contractual provision permitting termination without cause. We can not find, nor have the defendants cited, Minnesota case law which addresses this issue. Thus, we are inclined to follow the example of *Corenswet, Inc. v. Amana Refrigerator, Inc.*, 594 F.2d 129 (5th Cir.), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979) (exclusive distributor of twelve years terminated at will), and *Hubbard Chevrolet Co. v. General Motors Corporation*, 873 F.2d 873 (5th Cir.1989) (dealership agreement requiring written approval of manufacturer for any change in dealership location did not require GM to approve request made by dealer of 50 years), and hold that the express contract provision governs over the implied covenant.

■ USA Life does claim that defendant NCL breached its obligations of good faith and fair dealing by wrongfully transacting business with First Capital and Landmark Mortgage in violation of the terms of the Amendment Agreement. Essentially, USA Life seeks to recast its breach of contract claim as a claim in equity. However, that implied covenant does not extend to performance of actions outside the scope of the written agreement. *Beer Wholesalers, Inc. v. Miller Brewing Company*, 426 N.W.2d 438 (Minn.App. 1988); *American Warehousing*, 414 N.W.2d at 557–58.

■ Similarly, it is well established that where a fiduciary relationship is supported by contract, the parties' duties and obligations are exclusively defined by the terms of the agreement. *See, e.g., Phillips v. Chevron U.S.A., Inc.*, 792 F.2d 521, 524 (5th Cir.1986) (franchise agreement); *Meckel v. Continental Resources Co.*, 758 F.2d 811, 816 (2d Cir.1985) (corporate trust); *National City Bank v. Coopers & Lyb-*

*rand*, 409 N.W.2d 862, 866 (Minn.Ct.App. 1987), pet. rev. denied (Minn. Oct. 21, 1987) (same); *Anderson v. First Trust Company, Inc.*, 1990 WL 32386 at *5 (Minn.Ct. App. March 27, 1990) (*rev. denied* May 23, 1990) (same). The U.S. Court of Appeals for the Fifth Circuit has explained that " 'unless the contractual terms are unconscionable, illegal, or violative of public policy, fiduciaries, as a practical matter, acknowledge that activity in conformance with the terms of the contract cannot amount to misconduct that constitutes a breach of a fiduciary duty.' " *Phillips*, 792 F.2d at 524–25 (*quoting Carter Equipment Co. v. John Deere Industrial Equipment Co.*, 681 F.2d 386, 392 n. 14 (5th Cir.1982)).

■ We have already decided that NCL acted in accordance with its obligations under the contracts governing the parties fronting arrangement. Because the terms of those agreements can not be said to be unconscionable, illegal, or violative of public policy, plaintiff's claims for breach of obligations arising out of good faith and equity must fail. Accordingly, we grant partial summary judgment in favor of the defendants on plaintiff's claims for breach of good faith and fair dealing and breach of fiduciary duty.

G. Count Three: Tortious Interference With Contractual or Business Relationships

Plaintiff USA Life contends that NCL is liable for the tort of intentional interference with plaintiff's contractual and business relations with First Capital and Landmark Mortgage. Plaintiff contends that NCL willfully and intentionally induced these two companies to discontinue doing business with USA Life, at a time when USA Life and NCL were involved in an agency relationship. As a threshold matter, we reject plaintiff's attempt to characterize NCL as its "agent". Under the

---

11. We note, without making a factual finding or drawing a legal conclusion, that although the parties reinsurance arrangement was terminable at will, NCL attributed termination to what NCL believed to be specific and significant devi-

ations on the part of USA Life from account contracting procedures and other violations of the Administration Agreement. (Aff. Frank A. McCarthy, Jr., Ex. 6, Termination Letter, dated June 30, 1989).

terms of the fronting arrangement, clearly, *if an agency relationship existed between the parties*, NCL would be the principal and USA Life its representative. When NCL appointed USA Life its as "Administrator" of those creditor accounts reinsured under the Reinsurance Agreement, NCL *retained control* over the manner in which USA Life performed those administrative services. (Administration Agreement, ¶¶ 2(A)–(H)) Although Paragraph Seven of the Administration Agreement declares that "the relationship between the parties is that of independent contractors and not employee-employer," another term of the same agreement expressly requires USA Life to "service its Accounts by furnishing such assistance as is necessary to promote the sale of NCL's insurance products." (Administration Agreement, ¶ 2(B))

USA Life contends that NCL's alleged tortious conduct occurred in the states of Alabama, Mississippi and Louisiana. Because the laws of these states disagree as to what conduct gives rise to a cause of action for interference with contract or business relations, we must again determine which state's substantive law to apply. Although brought as a single count in the complaint, the alleged events giving rise to plaintiff's claim circumscribe two separate and distinct causes of action.

i. *Interference With Business Relationship Between USA Life And First Capital Mortgage Company*

▮ Because the record reveals that Alabama has the most substantial contacts with the events giving rise to USA Life's claim of unlawful interference with its business relationship with First Capital, we find that the law of that state governs that aspect of plaintiff's claim of tortious interference. *Boardman v. United Service Auto. Ass'n*, 470 So.2d 1024, 1031 (Miss. 1985). Although Alabama law narrowly recognized this cause of action in the past, the Supreme Court of Alabama recently announced a new rule acknowledging that "the rights of a party to a contract or business relation are of paramount importance in the business community and should be protected from unjust interfer-

ence by third parties." *Gross v. Lowder Realty Better Homes and Gardens*, 494 So.2d 590, 596–97 (Ala.1986). In *Gross* the Supreme Court of Alabama adopted the broad cause of action recognized in most jurisdictions, which includes not only interference with contractual relation, but also interference with business relation not necessarily involving a contract. *Id.* (*citing* 45 Am.Jur.2d, *Interference*, §§ 49–50 (1969); Annot., 26 A.L.R. 1227 (1952); Annot., 5 A.L.R.4th 9 (1981)). Thus, under Alabama law an action lies in tort where: (1) there exists a contract or business relation, (2) of which the defendant has knowledge, and (3) the defendant intentionally interferes with that contract or business relation, (4) without justification, and thereby (5) damages the plaintiff. *Id.*

▮ Having reviewed the pleadings, affidavits and deposition testimony filed in this action, we find evidence sufficient to preclude summary judgment on the issue of NCL's alleged tortious interference with USA Life's business relationship with First Capital. Defendants do not dispute that First Capital was doing business with USA Life prior to November 1988, when the parties executed the Reinsurance Agreement. Additionally, the deposition testimony of Tim King and Gary Vandergrift raises a question of material fact as to whether NCL knew, before meeting with those First Capital officers in April 1989, that the proposed captive company discussed included group and individual NCL policies reinsured by USA Life under the Reinsurance Agreement. Assuming that at that meeting NCL discovered this conflict for the first time, a genuine issue of material fact remains as to whether NCL intentionally and without justification proceeded with the captive company proposal.

NCL contends that it enjoyed a competitor's privilege to solicit business from First Capital not reinsured by USA Life under the parties written agreements. (Defs.' Reply Br. at 30–33) (*citing* the Restatement (Second) of Torts § 768(1) (1979)) Although Alabama law does not specifically recognize such a privilege, we believe that such a justification is not inconsistent with

the cause of action outlined by the Alabama Supreme Court in *Gross v. Lowder Realty Better Homes and Gardens*, 494 So.2d 590 (Ala.1986). Nevertheless, in that case, the Alabama Supreme Court made clear that under Alabama law "whether the defendant is *justified* in his interference is generally a question to be resolved by the trier of fact." *Id.* at 597 n. 3 (*citing Polytec, Inc. v. Utah Foam Products, Inc.*, 439 So.2d 683 (Ala.1983)) (emphasis added).

It is for the fact finder to consider the following factors and to decide whether NCL's conduct was improper. These factors are: (a) the nature of NCL's conduct, (b) NCL's motive, (c) the interest of USA Life with which NCL's conduct interfered, (d) the interest sought to be advanced by NCL, (e) the social interest in protecting the freedom of NCL's conduct and USA Life's contractual interest, (f) the proximity or remoteness of NCL's conduct to the interference, and (g) the relations between the parties. *Gross*, 494 So.2d at 597 n. 3 (adopting Restatement (Second) of Torts § 767 (1979)). Accordingly, whether NCL is entitled to a competitor's privilege is not a matter appropriate for summary judgment.

NCL also contends that, in order to make a prima facie case of tortious interference, USA Life must produce evidence tending to establish that the defendants' actions were the *only* cause of any damage the plaintiff may have suffered. (Defs.' Reb. Br. at 20–22) (*citing Johnson v. Warnaco, Inc.*, 426 F.Supp. 44, 47 (S.D.Miss.1976) (applying Mississippi law); *Harrison v. Prather*, 435 F.2d 1168, 1172 (5th Cir.1970) (same)) As Alabama law governs plaintiff's tort claim, NCL's reliance on federal decisions interpreting Mississippi jurisprudence is misplaced. Under Alabama law, USA Life is held to a lesser standard of proof, because "placing a 'but for' burden on [the plaintiff] would nullify and render useless the action for interference with a business relationship and destroy the protection it was designed to provide." *Utah Foam Products, Inc. v. Polytec, Inc.*, 584 So.2d 1345, 1353 (Ala.1991). Thus, USA Life need not demonstrate that the company could continue to write First Capital business without

NCL in order to preserve its tortious interference claim. Moreover, King testified at his deposition that First Capital enjoyed a "very good relationship [with USA Life] and had no reason to change other than to get a better deal." (King Dep. at 20) We find his testimony sufficient to create an issue of material fact as to whether NCL's offer of a captive proposal proximately caused the termination of USA Life's business relationship with First Capital.

ii. *Interference With Business Relationship Between USA Life And Landmark Mortgage Company*

■ Louisiana, where the solicitation of Landmark Mortgage occurred, recognizes only a very narrow cause of action for a *corporate officer's* tortious interference with the *corporation's contractual relations*. *9 to 5 Fashions, Inc. v. Spurney*, 538 So.2d 228 (La.1989). Prior to *Spurney*, there was no cause of action against a third party for intentional and unjustified interference with contract rights. *See Lucky v. Fricks*, 511 So.2d 1315, 1317 (La.App. 2d Cir.1987) To date Louisiana courts have refused to apply the *Spurney* exception outside the corporate officer context. *See American Waste & Pollution Control Company v. Browning–Ferris, Inc.*, 949 F.2d 1384, 1386–91 (5th Cir.1991) (*rehearing denied* January 29, 1992) (reviewing post-*Spurney* Louisiana jurisprudence). Noting that "it took the Louisiana Supreme Court almost 90 years to recognize a quite narrow cause of action for tortious contractual interference," the United States Court of Appeals for the Fifth Circuit concluded that "it is up to the Supreme Court of Louisiana and not this court to change the substantive law of that state." *Id.* at 1391.

USA Life has failed to provide authority supporting the viability of its tortious interference claim under Louisiana law. Because Landmark Mortgage and NCL are clearly distinct and unrelated corporate entities, USA Life can not avail itself of the *Spurney* cause of action. We have reviewed the jurisprudence in this area and can not find a post-*Spurney* Louisiana state court decision to sustain USA Life's

claim. Accordingly, we find instructive the Fifth Circuit's decision in *Browning–Ferris, Inc.* In that case, after similarly reviewing post-*Spurney* decisions of the Louisiana Supreme Court and lower state courts, the Fifth Circuit refused to recognize a cause of action for tortious interference with contract against a *competitor.* 949 F.2d at 1391. USA Life admits that "there is no genuine issue of fact to dispute that NCL did, in fact, compete with USA Life for the business of First Capital and Landmark [Mortgage]." (Pl.'s Resp. Defs.' Mot. Summ. J. ¶ VI) As stated in *Browning–Ferris, Inc.*, "it is not for this diversity court to expand that cause of action in the face of Louisiana's expressed unwillingness to do so." *Id.* at 1391. Therefore, we must grant defendants partial summary judgment regarding plaintiff's claim of tortious interference with its contractual and business relationship with Landmark Mortgage Company.

## H. Count Four: Conversion or Misappropriation

Plaintiff USA Life attempts to plead in tort a cause of action for the willful conversion of its insurance business. Plaintiff does not claim that NCL's actions constitute unfair competition or misappropriation of a trade secret. Nevertheless, as a business relationship is an "intangible" property interest which litigants commonly seek to protect under state unfair competition law, we consider whether a claim for misappropriation could survive defendants' motion for summary judgment.

Although the choice of law provision in the Administration Agreement does not necessarily apply to USA Life's claim of conversion or misappropriation, *Boardman,* 470 So.2d at 1031, the Court need not make that determination for the purpose of deciding defendants' motion, because the laws of the various states are not in conflict regarding this issue. *W.R. Grace & Co. v. Continental Casualty Company,* 896 F.2d 865, 874 (5th Cir.1990); *Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034, 1041 (D.C.Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982).

■ It is undisputed that USA Life established through its own efforts a substantial business relationship with First Capital and Landmark Mortgage. However, a business relationship is not the proper subject of a conversion claim. Under Minnesota law the tort of conversion is limited to the willful interference with the personal property of another. *H.J., Inc. v. International Tel. & Tel. Corporation,* 867 F.2d 1531, 1547 (8th Cir.1989) [hereinafter "*ITT Corp.*"] Similarly, the laws of Alabama and Louisiana limit the scope of conversion to that of "personal property". *See, e.g., National Surety Corp. v. Applied Systems, Inc.,* 418 So.2d 847, 849–50 (Ala.1982) (*citing* Alabama Code 1975, § 6-5–260); *Boris F. Navratil v. James H. Smart,* 400 So.2d 268, 275–76 (La.Ct.App. 1981) (conversion is one of the "acts" contemplated by La.Civ.Code art. 2315).

■ We have not found, nor have the parties cited, case law in the relevant jurisdictions which circumscribe the bounds of personal property subject to conversion. As the United States Court of Appeals for the Eight Circuit noted in *ITT Corp.,* the general rule is that the cause of action only applies to tangible property or intangible property customarily merged in, or identified with, some document or other tangible property. 867 F.2d at 1547 (*citing* Prosser and Keeton on Torts, 91–92 (1984); Restatement (Second) of Torts §§ 222A, 242 (1965)). In that case, the Eight Circuit refused to extend the scope of a conversion claim under Minnesota law to reach an intangible interest in a business relationship. *Id.* at 1548. An example of "intangible" property which is traditionally thought to merge with tangible property, and therefore to be subject to conversion, is an interest or share in a corporation identified by a stock certificate. *See, e.g., Succession of McGuire,* 151 La. 514, 92 So. 40, 42 (1922). Computer programs have also been held to be subject to conversion. *National Surety Corp. v. Applied Systems, Inc.,* 418 So.2d 847, 849 (Ala.1982).

The decision in *ITT Corp.,* 867 F.2d 1531, is particularly instructive because that case

involved business relationships and defendant conduct analogous to the facts here. In *ITT Corp.*, a distributor, H.J., Inc., sued a manufacturer of farm equipment and its parent corporation (ITT), alleging *inter alia* claims of conversion and misappropriation under Minnesota law. The distributor claimed that through its own efforts it built up a network of retailers which the manufacturer later converted for its own use by implementing a plan for direct sale to dealers. *Id.* at 1547–48. The written agreement which governed the business relationship between H.J., Inc. and the manufacturer was terminable without cause upon thirty days notice and did not provide H.J., Inc. with an exclusive distributorship. *Id.* at 1535. The Eighth Circuit, while upholding a jury finding that ITT, the manufacturer who sold hoists to dealers below cost, had tortiously interfered with prospective contractual relations between the distributor selling hoists and dealers, reversed a jury award in favor of the distributor on the conversion claim because H.J., Inc.'s claimed property interest was not supported by documentary evidence. *Id.* at 1547–48. Moreover, the court noted that Minnesota law provided no basis to expand the cause of action to protect an intangible interest in a business relationship with a group of dealers. *Id.*

Similarly, we find that USA Life's claim for conversion of its business relationships with First Capital and Landmark Mortgage is without merit. Although NCL was prohibited from contracting with creditor accounts reinsured under the Reinsurance Agreement, this limitation granted USA Life protection for only a *limited* period of time. (Amendment Agreement ¶ 4). Similarly, NCL's promise not to accept from its other general agents or administrators any business sold by creditor accounts reinsured under the Reinsurance Agreement is limited by the life of that agreement. (Amendment Agreement ¶ 5) Thus, the Administration Agreement can not be reasonably read to grant USA Life a convertible interest in its business relationships with First Capital and Landmark Mortgage.

■■ Most jurisdictions afford some protection for valuable information or other intangibles which provide an individual or business with a commercial advantage. In each of the several jurisdictions that have some substantial relationship with the fronting arrangement at issue, the Uniform Trade Secrets Act has been adopted without any significant variation which would affect this analysis. *See, e.g.,* Alabama Code 1975, §§ 8–27–1 to 8–27–6; Louisiana, LSA–R.S. 51:1431 to 51:1439; Minnesota, M.S.A. §§ 325C.01–.08.

USA Life claims to have provided NCL with a "customer list" but has not produced any evidence to support its claim. As for any claim of unfair competition, the identity of USA Life's customers is not a trade secret, or otherwise deserving of protection, because that knowledge could be easily duplicated from public sources. *Blackburn, Nickels & Smith, Inc. v. Erickson*, 366 N.W.2d 640, 645 (Minn.App. 1985). In *Erickson*, the Court of Appeals of Minnesota reviewed an action brought by a managing general insurance agency against a corporation formed by a former president and another employee of the agency. The *Erickson* court affirmed a jury verdict in favor of the corporation on the misappropriation claim, because the plaintiff's customers were "independent insurance agents, a limited group easily identified, and whose identity is not protected." *Id.* Similarly, First Capital and Landmark Mortgage are sizable and independent mortgage bankers, easily identified from public sources. Therefore, we find that their identity as customers of credit life insurance is not a trade secret subject to misappropriation. NCL's invitation to engage in a captive company arrangement which would exclude USA Life might seem "unfair" or "unjust", but *USA Life has no legal right to exclusive patronage of First Capital and Landmark Mortgage. See Erickson*, 366 N.W.2d at 645. Accordingly, we grant partial summary judgment in favor of the defendants on plaintiff's conversion (misappropriation) claim.

I. Count Five: Fraud

■■ Count Five of plaintiff's complaint asserts that NCL's conduct with respect to

plaintiff's insurance business constitutes common law fraud. In Minnesota and Mississippi where the alleged misrepresentations occurred, the elements of fraud are well established: (1) there must be a representation of a past or present fact, (2) that representation must be false, (3) the fact must be material and susceptible of knowledge, (4) the representer must know the representation to be false or ignorant of its truth, (5) the representer must intend to induce the plaintiff to act in reliance on the representation in a manner reasonably contemplated, (6) the plaintiff must be ignorant of the representation's falsity, (7) the plaintiff must have a right to rely on that representation, (8) the plaintiff must in fact rely on that representation, and (9) that reliance must be the proximate cause of plaintiff's injury. *Singing River Mall v. Mark Fields, Inc.*, 599 So.2d 938, 945 (Miss. 1992); *Accord, Midland National Bank of Minneapolis v. Perranoski*, 299 N.W.2d 404, 411 (Minn.1980). Although fraud is essentially a question of fact, it is never presumed, and each element must be proved by *clear and convincing evidence*, especially where a party seeks to avoid the effects of a written instrument. *Singing River Mall*, 599 So.2d at 945; *Beasley v. Medin*, 479 N.W.2d 95, 99 (Minn.App.1992) (following *Weise v. Red Owl Stores, Inc.*, 286 Minn. 199, 175 N.W.2d 184, 187 (1970)).

USA Life alleges that under the terms of the express contracts governing the parties' fronting arrangement, NCL misrepresented that it "would not directly contact any policy holders generated by USA Life or its agent, Kent Higdon," nor "interfere whatsoever in any customer relationship between USA Life[,] Financial Assurance Corporation or Kent Higdon in the transaction of this business," particularly in the State of Alabama. (Complaint ¶ V, VI; Higdon Dep. at 65–70, 179–88) Although such a representation would in fact be material, we have already concluded that the Amendment Agreement only required NCL to refrain from actually *contracting* with creditor accounts whose credit insurance is reinsured under the parties Reinsurance Agreement. (Amendment Agreement, ¶ 4) As noted above, the parties arrangement actually anticipated the likelihood that another general agent of NCL might solicit creditor accounts reinsured by USA Life, and provided that "NCL would not accept any business from those accounts through any general agent" other than USA Life. (Amendment Agreement, ¶ 5)

We have given effect to the Administration Agreement's Integration Clause which merges all prior or contemporaneous discussions or negotiations with that agreement. Thus, Kent Higdon could not reasonably rely on any alleged representation by NCL that the Reinsurance Agreement or Administration Agreement were "boiler plate" documents, and that all parties involved were in agreement that NCL recognized First Capital and Landmark Mortgage as the exclusive clients of USA Life. Because USA Life can not establish the elements of material misrepresentation, intent, or justifiable reliance, its fraud claim must fail.

■ USA Life also alleges that NCL's "[misuse of] its superior position to engage in self-dealing for its own benefit to the detriment of the plaintiff" constitutes fraud. (Complaint ¶ XX) We reject this argument as inadequate to support plaintiff's claim because it lacks any element of misrepresentation. Accordingly, we grant partial summary judgment in favor of the defendants on plaintiff's fraud claim.[12]

## J. PROOF OF DAMAGES

■ Finally, defendants argue that they are entitled to summary judgment on the ground that USA Life has produced insufficient evidence of actual damages during discovery or in response to the motion for summary judgment. USA Life contends that substantial information from which damages could be calculated is found in the deposition testimony of Tim King,

---

12. We note that to the extent Complaint ¶ XX may be read to state a claim for misappropriation (unfair competition), it has already been decided that the identity of First Capital and Landmark Mortgage companies is not a trade secret or otherwise deserving of protection, because that knowledge could be easily duplicated from public sources.

regarding the amount of credit life insurance premiums received by First Capital, and in Kent Higdon's deposition testimony regarding the various deductions that could be made in order to arrive at the amount that U.S.A. Life would actually receive as profit. In addition, U.S.A. Life has recently provided this Court and opposing counsel estimates, based on premium information recently made available by First Capital, of the net income USA Life would have received from First Capital business for the period from September 1, 1989, through July, 1992.

 Although the information provided by USA Life is not as thorough as it could be, we find it sufficient to defeat a motion for summary judgment. Under Alabama law, absolute certainty is not required: lost profits may be recovered if they are capable of ascertainment with reasonable, or sufficient certainty, or there is some basis on which a reasonable estimate of the amount of the profit can be made. *Mason and Dixon Lines, Inc. v. Byrd,* 601 So.2d 68, 71 (Ala.1992); *Utah Foam Products, Inc.,* 584 So.2d at 1353 (damage award affirmed where plaintiff could not prove it would have received contract).

NCL argues that because USA Life did not deduct any amount for its overhead costs, such as office expenses, salaries and taxes, its damage claim must be dismissed. While we believe a more detailed accounting of USA Life's net profits, including deductions for ordinary business expenses, should be provided before trial, we are not prepared to dismiss USA Life's claim on a motion for summary judgment because of failure to include these figures at this stage of the litigation. Thus, we find the information provided by USA Life is sufficient to defeat defendants' motion for summary judgment on this issue.

WHEREFORE IT IS ORDERED that partial summary judgment in favor of the defendants, NCL and FLA, be and hereby is GRANTED, on the following claims: Breach of express contract between USA Life and NCL, breach of an implied covenant of good faith and fair dealing, conver-

sion of USA Life's business, fraud, and breach of fiduciary duty.

IT IS FURTHER ORDERED that partial summary judgment in favor of the defendants, NCL and FLA, be and hereby is DENIED, regarding plaintiff's claim of tortious interference with USA Life's contractual or business relationship with First Capital Mortgage Company.

IT IS FURTHER ORDERED that partial summary judgment in favor of the defendants, NCL and FLA, be and hereby is GRANTED, regarding plaintiff's claim of tortious interference with USA Life's contractual or business relationship with Landmark Mortgage Company.